THE STATE (EX REL. SAMUEL R. TYRRELL,) *vs.* THE COMMON COUNCIL OF JERSEY CITY.

1. The charter of Jersey City vests in the common council power to expel a member for disorderly conduct. *Held,* that receiving bribes for his official influence and votes, is disorderly conduct on the part of a member, within the meaning of the charter.

2. The sentence of expulsion does not disqualify the individual expelled from being re-elected.

3. If re-elected, he cannot be expelled a second time for the same identical offence for which he had been once expelled.

4. The power to expel does not authorize the council to suspend a member from the exercise of his office.

5. If the council suspend a member, the court will grant a *mandamus* to the council to restore the member to the exercise of his legal rights.

On motion for *mandamus.*

The state of the case upon which this motion was argued is briefly as follows: The aldermen elected in the several wards constitute, *ex officio,* the common council of Jersey City. Among the powers conferred on the common council are the following:

1. To license, regulate, or prohibit inns or taverns.

2. To expel a member, for disorderly conduct or a violation of its rules, by a vote of two-thirds, the delinquent member first having had an opportunity to be heard in his defence.

3. To remove from office, for cause, any officer, except the mayor, by resolution adopted by a two-thirds vote, after he has had an opportunity to be heard in his defence.

The relator was an alderman and member of the common council, and, charges having been preferred against him of official corruption and bribery, a committee of the council was appointed by a resolution, in July, 1855, to inquire into the matter.

On the 8th of January, 1856, the committee reported to council the evidence before them, and formally presented a series of charges against said Tyrrell, the purport of which was, that he had, on or about the 3d day of July 1855, at Jersey City, corruptly intending to obtain money from various parties in said city, which money was to have been paid for procuring licenses, did, at his own instigation, receive from the following persons the sum of $50, each, for procuring licenses to keep an inn or tavern, that is to say (naming eight persons), the said sums not being intended to be applied or paid into the treasury of Jersey City, as a part of the public funds of the city, but to be applied to his own use and benefit; and the said persons then having applications for licenses pending before the council. And that about the same time the said Tyrrell corruptly offered to receive money from another person named, who also had a petition for a license pending before the council, for his own vote and influence in obtaining such license from said council, &c.

On the 10th of January ensuing, Tyrrell appeared by his counsel, pleaded not guilty to the charges, and thereupon witnesses were adduced and sworn to sustain them, and the accused also produced witnesses, who were ex-

amined in his defence ; and after hearing the evidence, the council, by a vote of twelve to two, resolved that the charges of bribery and corruption were fully sustained against him, and that he be removed from the common council.

Thereupon, pursuant to the authority vested in them by the charter, the council ordered a new election for one alderman from the fourth ward for the unexpired term of said Tyrrell.

An election was held, accordingly, in the said ward, on the 5th February, 1856, and Tyrrell was re-elected by a majority of votes. He was duly notified of his election, was sworn in according to law, and, upon his appearing and taking his seat in the common council, that body passed the following resolution, by a vote of twelve to two.

" Resolved, That the president of this common council be directed not to appoint Samuel R. Tyrrell on any committee of this body, and that the clerk do not call the name of Samuel R. Tyrrell among the list of members, in any action, vote, or proceeding of this common council, and that he be not allowed to take part in any debate on any question which may come before this board of aldermen."

The motion was for a peremptory *mandamus*, to be directed to the common council of Jersey City, commanding them to admit said Tyrrell to the exercise and performance of all his privileges and duties as a member of the said council.

Argued before Justices POTTS, RYERSON and VREDEN-BURGH ; *Ransom* and *Whitehead*, for relator ; *Scudder* and *Dayton*, for common council.

The opinion of the court was delivered by

POTTS, J. We have no doubt at all that the common council of Jersey City had the power to expel Tyrrell, upon being satisfied that he was guilty of the offence

with which he was charged, after having given him notice according to the provisions of the charter. The rule is well settled, that a corporation has, at common law, an inherent jurisdiction to expel a member for sufficient cause. If the offence charged is against the party's duty as a corporator, he may be expelled on trial and conviction by the corporation, without a previous trial and conviction at law; and it makes no difference whether the offence be one that is cognizable by a criminal court or not. Though it has been held, that if the offence has no specific relation to the party's duty as a corporator, yet is infamous, and so renders him unfit for the society of honest men, there must be a previous conviction at law. *Commonwealth* v. *St. Pat. Ben. Soc.*, 2 *Binney* 448 ; *Commonwealth* v. *Guardians of Poor*, 6 *Serg. & R.* 469 , 2 *Kent's Com* 297 ; *Angell & Ames on Corporations*, § 423. But the jurisdiction exercised in this case is not derived from the common law. The common council is not the corporation, and, whatever powers a municipal corporation may have to amove or expel a member for cause at common law, it is clear that the corporation itself has not, by any by-law, delegated any of them to the common council, and that body, therefore, cannot avail itself of the common law jurisdiction, vested as an inherent right in the corporation itself, to expel a member of their own body. 2 *Bac. Abr.* 21, *Title* " *Corporations*"; *Wilcox on Corporations*, § 629. The council derives its jurisdiction from the charter of the corporation. The thirty-fifth section of that charter gives to the common council expressly the power to " expel a member for *disorderly conduct.*" The whole question, as to the right to expel for the conduct charged in this case, depends upon the construction of these words. And it must be admitted that no clear light has been thrown upon this question by the action of the senate of the United States in the exercise of their constitutional power to expel a member. The power vested in

the two houses of congress by the Constitution, Art. 1, §
5, par. 2, is in different phraseology; it is, that "each
house may determine the rules of its proceedings, punish
its members for disorderly behavior, and, with the con-
currence of two-thirds, expel a member." Under this
power, the senate, in 1797, expelled a member of that
body for an offence not committed in his official charac-
ter as a member, nor during a session of Congress, nor
while the member was at the seat of government. *Blount's
case, Story's Com. on Const., ch.* 12, § 836. But it is not
clear that the power to expel is limited by the constitution
to the cause of disorderly behavior, and in that respect it
differs from the language used in the charter of Jersey
City.

The question then is, what is "disorderly conduct,"
within the meaning of the charter, for which a member
may be expelled. The counsel for the relator would limit
it to acts of turbulence, violence, or disorderly conduct in
the body, and during the sessions of the common council.
Suppose, for a moment, this is so, and that the council
exceeded their jurisdiction, can he avail himself of the
error now? He admitted the jurisdiction; he appeared
and pleaded not guilty to the charge; submitted to a trial;
submitted to the sentence of expulsion; submitted to the
proceedings for a new election; suffered himself to be pre-
sented as a candidate before the people for a re-election,
and now comes here claiming to have a title to his seat and
the right to exercise the privileges and duties of the office
by virtue of his re-election. We apprehend he is too late
to raise the question of jurisdiction, and insist he never was
legally expelled. But if he has a right to raise the objec-
tion now, there is nothing in it.

The words "disorderly conduct," as they stand in the
charter unlimited and unexplained, have a broader signi-
fication than that contended for by the counsel of the
relator. The legislature have not said that the conduct

termed disorderly must consist of acts or words in the body, and during the session of the council, and we are not warranted in saying so. But we are to construe the words in reference to the subject matter with which the legislature was dealing when it used them. They had reference to the conduct of a member of council, as such, not as a member of the corporation, nor as a citizen, but as a member of council acting in his official character, no matter where or when. He who, intrusted with official power, violates his public obligations, betrays his official trust, and abuses the public confidence by selling his official influence or vote in the body of which he is a member, is guilty of disorderly conduct of a far deeper dye than he who merely forgets the proprieties of official business and intercourse. The violation of a rule of morals is a more henious offence than the violation of a rule of order, as crime is more base and malignant than turbulence. Any conduct which is contrary to law is within the definition of disorderly conduct, as given by standard lexicographers, and any gross violation of official duty on the part of a member of the common council is within the legal meaning of the words used in the charter.

Here the relator was charged with receiving bribes in his character of a member of the council; with official corruption; with yielding his judgment and conscience, in the honest exercise of which the public had a right to confide, to mercenary appliances. The charge appertained to his character as an officer, a member of council; and we think there can be no doubt that the common council had a right to arraign, try, and, finding him guilty, to expel him. Suppose it had been charged and proved that the bribes had been received in the common council chamber and during the session of the body in the very presence of the members, could it possibly be contended that that would not have been disorderly conduct within the meaning of the charter? But why? Not because the trans-

action interrupted or disturbed the orderly progress of the business of the council, but because it was in itself an act of lawlessness, of turpitude, a gross violation of duty on the part of the member inculpated. The disorder would have consisted in the nature and character of the act, not in the manner or place in which it was done. And is the nature and character of the act, in its moral aspect, changed at all by the fact, that it was committed out of the council chamber, and when the body was not in session? We think such a distinction in such a case the court is not called upon to draw.

We have said thus much upon this point, not because it is very material to the question before us, but because it was elaborately argued on both sides at the bar.

2. In the second place, we are of opinion that the sentence of expulsion, or amotion, did not disqualify Tyrrell to be re-elected to the same office. When the council expelled him, they had exhausted their power; their authority went no further; the charter does not annex to the sentence of expulsion that of disqualification; nor have the council, nor could they legally. Where the law annexes a disqualification to an offence, as part of its punishment, it does it in express terms. *Constitution of U. S., Art.* 1, § 3, *pl.* 7; *Constitution of N. J., Art.* 6, § 3, *pl.* 3; *Nix. Dig., Tit.* "*Witness,*" § 1. It was argued, with some earnestness, that the virtual effect of the re-election in this case was to reverse the judgment of the common council, and that the electors of the ward had no power to do that. The conclusion may be admitted if the premises are sound. But in point of fact here is no reversal of the judgment; that was executed; the offender was deprived of his office. The judgment was a judgment of expulsion, and that was carried into effect. The judgment extended no further, it was not a judgment of disqualification operating in *futuro.* The law does not add that penalty to the offence of which he was convicted, and we can add nothing to the law.

The same answer must be given to the argument, that the expulsion was for the term, and operated as a disqualification for the remainder of the term for which Tyrrell had been originally elected. As future disqualification is no part of the sentence authorized or inflicted, no such effect can be given to it by the court. The operation, the effect, the consequences of the judgment, began and ended with the expulsion. It is asked with pugnancy, by those who represent the common council, whether a member of that body, who is adjudged to-day to be guilty of receiving bribes, of selling his vote and influence, or of other gross official corruption, and is therefore expelled as unfit to exercise his office, or even to associate with men of character, can possibly be fit to fill the same office to-morrow; and whether such a man can be thrust back upon a body of honorable and upright men, as their official compeer and associate, by a misguided constituency, with the odor of his corruption fresh about him? These, however, are questions for the law making power to consider. It is for the legislature to say how far it is necessary, in particular cases, to limit the power of the members of a common council, or punish particular offences, and not for the courts. The legislature may well have supposed that the power to expel was all that was necessary; and that what remained might safely be trusted to the hands of the voting members of the corporation.

3. The question, whether Tyrrell, having been expelled from the council upon conviction of official corruption, and having been re-elected, can be again expelled for the same identical offence, is not properly before the court. If it was, we apprehend there could be no difficulty in deciding it. The council have no power to expel a member for acts committed previous to his election; nor can a man be twice arraigned, tried, convicted, and punished in the same form for the same offence. These are propositions which can hardly be seriously controverted.

4. It only remains to be considered, whether the action of the common council in resolving that "the president of council be directed not to appoint Tyrrell on any committee, and that the clerk do not call his name among the list of members in any action, vote, or proceeding of the council, and that he be not allowed to take part in any debate on any question which may come before the board of aldermen," is warranted by law. We think it entirely clear that it is not. This proceeding amounts to a suspension of the relator from the exercise of his official duties, as a member of that body. It leaves his constituents unrepresented and without remedy. Expulsion creates a vacancy that can be supplied by a new election. Suspension from the duties of the office creates no vacancy; the seat is filled, but the occupant is silenced. The charter vests no such power in the council; it would be extraordinary if it did. The power is to expel, not to suspend.

It has not been seriously questioned that a *mandamus* is the appropriate remedy in a case like this. The books are full of authorities in support of it. *Wilcox on Municipal Corporations* 368, § 74, 75; *Ibid* 377, § 96, (14 *Law Lib.* 200, 206); 1 *Ch. Gen. Pr.* 798; 3 *Black. Com.* 110; *Rex* v. *Barker*, 3 *Burrowes* 1266; *Angell & Ames on Corporations* 706, § 702, and cases there cited.

We are of opinion that a *mandamus* should issue to the common council of Jersey City to restore the relator to the exercise of his legal rights as an alderman and member of that body, from which he has been suspended by the resolution in question.