THE ATTORNEY-GENERAL, *ex rel.* CANNON *et al. vs.* WILLIAM E. CLARKE, City Clerk.

PROVIDENCE—NOVEMBER 16, 1904.

PRESENT: Tillinghast, Douglas, and Blodgett, JJ.

(1) *Mandamus. Elections. Nomination Papers.*

Nomination papers were submitted to the city clerk of the city of Providence, under the provisions of Gen. Laws cap. 11, § 13, for certification as to the number of qualified voters represented by the signatures thereon. The city clerk certified that more than the required number of signatures were the names of qualified voters, but subsequently, after an investigation, certified that a sufficient number of names were shown to have been fraudulently signed to reduce the number below the required number and refused to place the names of the candidates upon the official ballot.

Upon *mandamus* to the city clerk, and after hearing:—

*Held,* that sufficient objections appeared, together with evidence of deliberate fraud, to justify the refusal of the petition for *mandamus.*

(2) *Elections. Nomination Papers.*

Gen. Laws cap. 11, § 13, provides that "Each voter signing a nomination paper shall add to his signature his place of residence, and each voter may subscribe to one nomination for each office and no more":—

*Held,* that the word "subscribe" as used in the section was restricted in its application to an act performed by one in person, but did not include that which one does for another under claim of authority so to do.

(3) *Elections. Nomination Papers. Signatures.*

The name of a qualified voter as it appears upon the voting lists is the standard by which the signatures to nomination papers are to be tested. This excludes abbreviation and initials, unless they appear on the voting list.

(4)   *Electors.   Nomination Papers.*

By the provisions of Pub. Laws cap. 1078, § 8, the signing of nomination papers is a disqualification for participation in the caucus of any party, and the participation in the caucus of any party is a disqualification to sign nomination papers, but the signing of nomination papers in one case is not a disqualification for the signing of nomination papers in another case.

Gen. Laws cap. 11, § 14, provides that nomination papers shall contain as to each candidate " the party or political principle which he represents expressed in not more than three words ":—

*Held*, that the primary purpose of these provisions for nominations was that electors might place in nomination candidates representing a political principle which they desired to support at the polls, and not that persons might nominate candidates whose principles they did not adopt and whom they expected to oppose at the polls.

MANDAMUS.   Heard and dismissed.

BLODGETT, J.   The relators, Peter C. Cannon, Henry M. Winn, Lawrence J. Coffey, Thomas A. Armstrong, and John J. Shanley, pray for a writ of *mandamus* to the respondent, as city clerk of Providence, to require the latter to print upon the official ballot the name of said Cannon as a " Good Government" candidate for alderman, and the names of the said Winn, Coffey, Armstrong, and Shanley as " Good Government" candidates, respectively, for members of the common council from the tenth ward at the municipal election to be holden on November 8, 1904, averring in substance that the relators have severally been placed in nomination for said offices upon nomination papers having the names of at least fifty duly qualified electors of said ward, as required by the provisions of § 13, cap. 11, Gen. Laws, as amended by Pub. Laws, cap. 1,059, § 2, and that the respondent wrongfully refuses so to do.

Section 13, cap. 11, Gen. Laws, is as follows:   " Each voter signing a nomination paper shall add to his signature his place of residence, and each voter may subscribe to one nomination for each office to be filled and no more.   The nomination papers shall, before being filed, be respectively submitted to the city or town clerks of cities or towns in which the signers purport to be qualified voters, and each city or town clerk to whom the same is submitted shall forthwith certify thereon

what number of the signatures are names of qualified voters in the city or town for which he is clerk."

The nomination papers in question were filed with the city clerk on October 24, 1904, and bear his certificate, under that date, as follows: "I hereby certify that fifty-four of the within signatures are names of qualified electors within the city of Providence for which the within nomination is made. Wm. E. Clarke, City Clerk."

At that time there had been no question made as to the genuineness of any of the signatures upon these nomination papers. This issue was, however, subsequently raised, and the record shows the following to have been the subsequent action of the respondent in the premises.

> "CITY CLERK'S OFFICE,
>
> "PROVIDENCE, R. I.,
>
> "October 28th, 1904.

"*To Whom it May Concern*:

"I, William E. Clarke, city clerk of the city of Providence, hereby certify that, upon charges of fraud being made relative to the nomination papers filed with me designated as 'Good Government' nominations for the offices of alderman and common councilmen of the tenth ward, I proceeded to investigate the same. I gave the persons preferring the charges and the candidates affected by the charges a hearing, and received the evidence presented relative to the same.

"Five persons whose names and addresses appeared upon said nomination papers testified under oath. Four of them said that they did not sign nor authorize any one to sign for them said papers, and repudiated the signatures of their names thereon as forgeries. The other person, who could not read or write, admitted he had made a cross on this paper and previously on another nomination paper, but said he supposed that he was signing both as nomination papers for school committee, and that it was not stated to him by the two men who brought him this paper, one of whom was the son of the school committee candidate, that the nominations were for alderman and councilmen. Said two men both testified that they or

one of them explained or read to him what the nominations on this paper were.

"I also received an affidavit signed by William Hawkins, stating that he had not signed or authorized any one to sign for him said nomination papers; also the certificate of Doctor E. J. Logan that Mr. Hawkins was sick in bed; also the testimony of a witness present as to the serious illness of Mr. Hawkins. Under the advice of the law department, that said affidavit under the circumstances should be received, I admitted the same. A witness testified that Mr. Hawkins signed said papers with his mark in his presence, and that he wrote Mr. Hawkins's name and address on the paper opposite said mark. This witness upon being requested to write the name of William Hawkins, wrote it as follows: 'William Harkins,' while on the nomination paper it was clearly and correctly spelled. There was some evidence less directly in point.

"I am convinced by the whole evidence that at least five of the six names were never signed by the parties, and that the same were fraudulently and illegally placed or forged on said nomination papers, and that said nomination papers are tainted with deliberate fraud and intentional violation of the law by some person or persons to me unknown, who at some time had charge of obtaining the signatures to said papers.

"This gives rise in my mind to suspicion and doubt whether there may not be other names fraudulently signed on said papers. There is a sufficient number of names shown to have been fraudulently signed or forged to reduce the number certified on the nomination papers below the required number of fifty.

"In view of the premises, I do not believe it is my duty to carry on and aid said fraud and illegality, and therefore I hereby decline to place upon the official ballot said 'Good Government' nominations for the offices of alderman and common councilmen of the tenth ward.

"WILLIAM E. CLARKE,

"*City Clerk.*"

It is admitted by the relators that ' of the ninety-eight names

appearing upon these papers at the time they were filed with the respondent, nearly one in every three was the name of a person disqualified for other reasons than the forgery found to have been practiced, viz.: some for non-residence, some for non-qualification as electors, and some for having voted in a caucus within the provisions of § 8, cap. 1,078, Pub. Laws, as follows: "No person shall be entitled to vote or take part in the caucus of any political party who within fourteen calendar months has voted or taken part in the caucus of any other political party, or has signed nomination papers of a candidate or candidates for any elective officer, or has voted in any election for the candidates of any other political party or for candidates placed in nomination by nomination papers, or is debarred from so voting or taking part by the regulations of such party provided for in section two of this act. No person who has voted in the caucus of any political party shall be eligible to sign any nomination paper containing nominations of candidates, within fourteen calendar months thereafter." And we are of the opinion that the names of those persons who had previously signed the nomination papers for one Birmingham for one of these offices were properly rejected under the provisions of § 13, cap. 11, aforesaid: "Each voter signing a nomination paper shall add to his signature his place of residence, and each voter may subscribe to one nomination for each office and no more." We are of the opinion, too, that the word "subscribe" should be here construed as it was construed by the Court of Appeals of New York in construing the statute of frauds of that State in *James* v. *Patten,* 6 N. Y. p 12: "The etymology and definition of the word *subscribe,* as given by lexicographers, show that its meaning when applied to the signature to an instrument in writing, as understood by men of letters, is the signature or writing of one's name beneath or at the end of the instrument. . . . The derivation of that word from the Latin word *subscribo* shows that literally, and according to its derivation, its meaning is 'to write under or underneath.' But this is not the primary or derivative meaning of the verb 'to sign.' Such meaning is, to write one's name on paper or to show or declare assent or attestation by

some sign or mark," and again, on p. 17, Mr. Justice Gardiner, in his concurring opinion, says: "In the revision of the statutes, the legislature intended to substitute the popular meaning for one adopted by judicial construction. They did this by a change of phraseology, in substituting 'subscribed,' which indicates the making of a particular kind of signature, for 'signed,' which applied to every species of written authentication."

This construction obviously restricts the meaning of the word *subscribe* as used in the section in question to an act performed by one in person, and does not include that which one does for another under claim of authority so to do.

(3)     It was said by this court, *In Re The Polling Lists*, 13 R. I., 732, that: "In making up these lists the canvassers are in our opinion required to proceed in a manner which is well calculated to insure the listing of all qualified voters, and which affords to any person claiming a right to vote a fair opportunity to establish his right if he can, and have his name *duly* enrolled." This properly places upon the voter the duty of attending to the proper entry of his name upon the voting list, and we are of opinion that the name as it there appears is the standard by which the signatures to nomination papers are to be tested. This obviously excludes abbreviations and initials, unless they appear on the voting list.

(4)     The relators contend that the names of those signers who had previously signed nomination papers for general officers on the Socialist-Labor ticket were improperly deducted.

By the provisions of § 8, cap. 1,078, *supra*, it will be observed that the signing of such nomination papers is a disqualification for participation in the caucus of any party, and that the participation in the caucuses of such a party is a disqualification to sign the nomination papers in question, but that the signing of the nomination papers in the one case is not a disqualification for the signing of nomination papers in the other.

Section 14, of cap. 11, Gen. Laws, provides that nomination papers shall contain, among other things, as to each candidate, "the party or political principle which he represents, expressed in not more than three words." Unquestionably the primary

purpose of these provisions for nominations was that electors might place in nomination candidates representing a political principle which they desired to support at the polls, and not that persons might nominate candidates whose principles they did not adopt and whom they expected to oppose at the polls. The provision in question is so clearly in accord with the spirit of the law as to have great weight in controlling our discretion as to the granting of the writ prayed for.

At the hearing before us it was abundantly established by affirmative proof that willful and deliberate forgery had been practiced as to certain names on said nomination papers, substantially as set forth in the record of the hearing before the city clerk.

Whether this fraud was practiced in other instances than these proved before us we are of course unable to determine. Suffice it to say that the objections heretofore considered, together with the fraud affirmatively established, justifies us in our refusal to grant the prayer of the petition.

Petition dismissed.

*Peter C. Cannon,* for relators.

*Francis Colwell, Albert A. Baker, Henry C. Cram,* for respondent.