271 A.2d 798.

MARTIN S. MALINOU *vs.* BOARD OF ELECTIONS *et al.*

DECEMBER 21, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. The petitioner aspires to be the Democratic Party's nominee for the office of United States Senator in the November 1970 general election. We issued a writ of certiorari[1] to review a decision of the State Board of Elections holding that the petitioner was not a qualified candidate for the party's primary election because he had not procured the required number of signatures that would authorize the Secretary of State to place the petitioner's name on the primary election ballot. Hereafter, we shall

---

[1]The petitioner was in doubt as to the correct procedural route to follow. He had filed two appeals in the Superior Court. One from the action of the local boards of canvassers; the other was from the decision of the state board. In both appeals he adhered to the procedures set forth in the Administrative Procedures Act.

On August 19, 1970 the appeals came on to be heard on petitioner's motion that they be assigned for immediate hearing. The motions were denied on the grounds that defendants had not entered appearances and that the record had not been certified since the Administrative Procedures Act allows a defendant agency 30 days in which to certify the record under review.

The petitioner then filed the instant petition. It is a common law petition for certiorari and was initially brought against the state board and 22 different local boards. We have, in the interest of resolving petitioner's claims in an expeditious manner, limited the issuance of the writ to a review of the state board's decision. Our action is not to be considered as precedent for any further action in this area. We leave the determination of the procedural issue involved herein to another time. Two other candidates who qualified for the Democratic Primary were invited to participate in this cause as parties in interest if they so desired. See *Malinou* v. *Board of Elections*, 107 R. I. 917, 268 A.2d 736. One of the candidates, John Quattrocchi, Jr., filed a brief and appeared before us during the oral argument. The other candidate, United States Senator John O. Pastore, acknowledged the receipt of our order but informed us that he had no desire to take any position relative to the present proceedings.

refer to the State Board of Elections as either the respondent board or the state board.

On June 26, 1970, petitioner, acting in pursuance of G. L. 1956 (1969 Reenactment) §17-14-1, filed in the Secretary of State's office a declaration of candidacy which signified his intention to be a candidate for the United States Senate at the September 15, 1970 Democratic Party's primary. Thereafter, the Secretary of State furnished petitioner with sets of duly authorized nomination papers. The petitioner and his supporters then began their efforts to comply with §17-14-7[2] and thereby obtain signatures of at least 1,000 "party voters." On July 24, 1970, and again on July 25, 1970, petitioner filed his nomination papers with the Boards of Canvassers located in some 28 various municipalities throughout the state.

The canvassing boards checked the signatures and the addresses appearing on the papers and in early August 1970 rendered reports to the Secretary of State which certified that petitioner's nomination papers contained a total of 856 valid signatures. The petitioner appealed the canvassers' findings to the respondent board. The board conducted a lengthy and extensive hearing on petitioner's appeal. During the hearing, the board validated an additional 17 signatures previously invalidated by the local boards. The respondent board's action still left petitioner 127 signatures "shy" of the required 1,000.

In his petition, Malinou contends that the state board erred in disallowing 195 other signatures appearing on his papers. A study of these disputed signatures shows that they may be categorized as follows: 149 persons who had signed petitioner's nomination papers in a form which

---

[2]The statute requires that nomination papers of candidates for the United States Senate or Governor contain the signatures of at least 1,000 party voters, with each of the five counties of the state being represented thereon by at least 25 resident signers.

varies from the form in which the names or addresses of the signatories appear on the voting lists; 17 persons who, at the time they signed petitioner's papers, were not qualified voters; 26 signatories who had within the prior 26-month period signed nomination papers of candidates of a party other than the Democratic Party;[3] and finally, 3 signatures were invalidated after a diligent search of the records of the Providence Board of Canvassers failed to show that the signatories were registered voters.

Of the 149 names in the first category, 124 thereof were invalidated because the names as they appear on the nomination papers differ in form from the names as they appear on the voting list. Simple mathematics show that, if the state board was correct in refusing to validate the 124 names referred to in the first category of disputed signatures, petitioner's cause is lost. For even if we were to assume that the state board should have validated all of the remaining contested signatures, petitioner's nomination papers would not contain the 1,000 signatures demanded by the statute. Because of our ultimate conclusion, we shall limit our consideration to petitioner's entitlement to have the 124 names[4] certified as being valid signatures.

The respondent board bases its refusal to validate the 124 names on §17-14-8 (1969 Reenactment), which reads as follows:

> "Not all endorsers of a candidate need sign on the same nomination papers, but endorsers who are voters in different cities and towns shall not sign the same sheet. *Every voter signing a nomination paper*

---

[3]Section 17-15-24 (1969 Reenactment) designates a person who has signed the nomination papers of a candidate of one political party as being ineligible to sign the nomination papers of another party's candidate within the next 26 months.

[4]See Appendix.

*shall sign in person with his name, place of residence and street number, if any, as it appears on the voting list;* but any voter who is unable to write may sign by making his mark (X) on the nomination paper in the presence of two witnesses who shall subscribe their names on the paper as witnesses to the signing." (italics ours.)

The petitioner argues that the italicized portion of this section violates both the due process clause of the fourteenth amendment of the United States Constitution and a certain portion of 42 U.S.C.A. §1971. In the alternative, he asks that we construe §17-14-8 so as to hold that a substantial compliance with the statute cited above will satisfy the mandate of this section.

We find no merit in any of the positions espoused by petitioner.

The petitioner's constitutional attack on the statute is based upon his bald assertion that this legislation "unreasonably requires perfection" of a signatory's memory and manual dexterity. Before determining the constitutionality of the law, we shall restate certain well-established rules of law governing the determination of a challenge addressed to the constitutionality of a legislative enactment.

Any act passed by the General Assembly and approved by the Governor carries with it a presumption of constitutionality, and the challenger, in seeking to overcome this presumption, has the burden of proving the statute's unconstitutionality beyond a reasonable doubt. *Chartier Real Estate Co.* v. *Chafee,* 101 R. I. 544, 225 A.2d 766. If any state of known or assumed facts would justify the law, the court's power of inquiry ceases. *Morrison* v. *Lamarre,* 75 R. I. 176, 65 A.2d 217. The wisdom, need, or appropriateness of a statute are for the legislative but not the judicial branch of our government. The guaranty of due process demands only that the law shall not be

arbitrary, unreasonable, or capricious and that it be reasonably related to the public health, safety, morals, or general welfare. *Avella* v. *Almac's Inc.*, 100 R. I. 95, 211 A.2d 665; *Nebbia* v. *New York*, 291 U. S. 502, 54 S.Ct. 505, 78 L.Ed. 940. Our function then is to decide whether the purpose of §17-14-8 is legitimate and whether this statute is designed to accomplish its purpose in a fair and reasonable manner. If the legislation meets this test, the constitutional requirement of due process has been satisfied. *Pierce* v. *Albanese*, 144 Conn. 241, 129 A.2d 606.

The Rhode Island constitution vests in the General Assembly the exclusive jurisdiction over the manner of conducting elections. *Bilodeau* v. *Dolan*, 85 R. I. 348, 131 A.2d 686. Further, we have said that it is the Legislature's prerogative to provide for the recognition of political parties, to define membership therein, and by appropriate measures to prescribe procedures for the orderly conduct of their affairs and secure stability for the political system created thereby. *Parise* v. *Board of Canvassers and Registration*, 92 R. I. 493, 170 A.2d 292; *DeCesare* v. *Board of Elections*, 104 R. I. 136, 242 A.2d 421.

Section 17-15-1 states that the primary election for the nomination of candidates for each political party shall be held on the second Tuesday after the first Monday in September of each evenly numbered year. The General Assembly has also established a timetable which the candidates and state and local election officials must meet in order to assure that the primary will be held as scheduled. Chapter 14 of title 17 contains this timetable.

Declarations of candidacy for state office must be filed with the Secretary of State within the last 10 days of June in the even years. Upon receipt of the declarations, the Secretary of State prepares nomination papers for the candidates for state office which must be delivered to the respective candidates anytime between six and nine days

after the final day for filing declarations of candidacy. Section 17-14-11 requires that the nomination papers be filed with local boards of canvassers on or before five o'clock in the afternoon of the fifty-second[5] day before the primary. The boards shall "* * * proceed forthwith to check all signatures, on each nomination paper filed with it, against the voting list * * *" and "* * * shall certify the number of names of qualified electors * * * appearing thereon * * *." The local board of canvassers must, because of §17-14-12, file with the Secretary of State not later than forty-five days prior to the primary the candidate's nomination papers together with a certificate showing the number of qualified electors appearing on the nomination papers. The chapter goes on to detail procedures for determination of the objections to the eligibility of a candidate or the sufficiency of the nomination papers.

It is clear from a reading of chap. 14 of title 17 that the local boards of canvassers have no more than seven days to check *all* the signatures on *all* nomination papers of *all* candidates seeking either state or local office. The candidates belong to the Democratic or Republican Party and they seek a variety of offices ranging from the rather exalted position of United States Senator to the posts of ward committeeman in a city, or town committeeman in one of the smaller municipalities in this state. The torrent of signatures pouring into the canvassers' offices can easily be imagined.

The task confronting a local board as it attempts to comply with the schedule set forth in §§17-14-11 and 17-14-12 is a formidable one. We think that a primary aim

---

[5]As noted before, some of petitioner's nomination papers were submitted to the local boards on July 24, 1970 and the rest were filed on July 25, 1970. This year, the last day for filing nomination papers was July 25 and July 24 was the next to the last day

of the Legislature in enacting the requirement of exact conformity called for in §17-14-8 was to insure that the local boards can check all the nomination papers filed with them and report to the Secretary of State within the alotted time established by the statutes already referred to. If a party voter truly wishes that the individual's name whose candidacy he endorses should appear on the primary ballot, the least he can do is to comply with the provisions of §17-14-8. We can see nothing palpably arbitrary or unreasonable with the statute and we therefore reject petitioner's contention that it denies him due process. Nor is our view altered because a current list of voters is not made up by a local board until sometime after the deadline for filing nomination papers.[6] While the only list of voters available to any candidate seeking signatures was the list made up from the 1968 general election, we still believe that if anyone has registered in the almost two-year hiatus between then and the time they have signed petitioner's papers, it is not unreasonable that they should sign in a fashion set forth in the statute.

The petitioner, in claiming that respondent board has violated federal law, states that the board's disqualification of the 124 signatures is proscribed by 42 U.S.C.A. §1971(a)(2)(B) which reads as follows:

"(2) No person acting under color of law shall —
"* * *

"(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such

---

[6]Section 17-10-4 reads that a preliminary list of persons who appear to, be duly registered to vote shall be published within 30 days after the close of registration for each general election and each primary election. This year the publication date for the primary was August 15. 1970. .

individual is qualified under State law to vote in such election * * *."

The petitioner then skips on over to subsection 1971(e) where the term "vote"[7] is defined and he then comes up with the conclusion that the state board has denied the signatories' right to vote for him in the September primary. In his "hop, skip, and jump" approach to the federal statutes, petitioner completely overlooks, or ignores, the explicit provisions of §1971(a)(1) and the legislative background of §1971(a)(2)(B).

Section 1971(a)(1) states:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

Section 1971(a)(2)(B) was originally a part of Title 1 of sec. 101 of the Civil Rights Act of 1964. The legislative purpose of this enactment can be found in 2 U. S. Code Cong. & Ad. News (1964) at 2394, which says:

"Section 101(a) is designed to insure nondiscriminatory practices in the registration of voters for Federal[8] elections. It would amend existing law 42 U.S.C.

---

[7]"(e) When used in the subsection, the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election * * *."

[8]This section was amended by the Voting Rights Act of 1965 whereby the word "federal" was deleted and the word "any" was substituted in its place.

1971(a) by requiring the application of uniform standards, practices, and procedures to all persons seeking to vote in Federal elections and by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating to such voting."

The definition of voting relied on by petitioner made its appearance on the statute books as a part of the Civil Rights Act of 1960. The Supreme Court in *United States* v. *Mississippi*, 380 U. S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 declared that sec. 1971 was passed by Congress under the authority granted it by the fifteenth amendment to bar any type of racial discrimination in voting.

The petitioner's interjection of civil rights legislation in these proceedings has caused us to examine *Gaston County* v. *United States*, 395 U. S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309; *Allen* v. *State Board of Elections*, 393 U. S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1; and *South Carolina* v. *Katzenbach*, 383 U. S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769. All three cases deal with the Voting Rights Act of 1965 (42 U.S.C.A. §1973). We are convinced after reading them that all federal voting rights legislation is aimed at any state law which has the effect of denying citizens their right to vote because of their race. Nowhere in this record is there the slightest hint that the state board disallowed the disputed signatures because of the "race, color, or previous condition of servitude" of either the signatories or the candidate whose nomination papers they signed. There is no literacy test in Rhode Island. In fact, a complete examination of §17-14-8 shows that the Legislature has expressly provided for the voter who is unable to write. All he need do is to make his mark in the presence of two witnesses who subscribe their names on the paper as attesting witnesses and, if he be otherwise qualified, his "signature" will be validated. It should also be noted in passing that judicial remedies made available by Con-

gress under the provisions of this legislation are to be found in the federal and not the state courts. §1971(c).

In addressing ourselves to petitioner's suggestion that, in construing §17-14-8, we should invoke the doctrine of substantial compliance, it is necessary that we briefly delve into the historical past and discover how the exactitude required by the statute in question evolved into a legislative mandate.

Over 65 years ago, in 1904, this court first enunciated the rule that the standard by which a voter's signature on a nomination paper was to be tested was his signature as it appeared on the voting list. *Attorney General* v. *Clarke,* 26 R. I. 470, 59 A. 395. The court ruled that this standard excluded the use of abbreviations and initials unless they appeared on the voting list. The statute at issue before the court was G. L. 1896, chap. 11, sec. 13. The relevant part thereof reads as follows: "Each voter signing a nomination-paper shall add to his signature his place of residence * * *." This holding in the *Clarke* case was later followed in *Stone* v. *Waterman,* 70 A. 1009 and *Dupre* v. *St. Jacques,* 51 R. I. 190, 153 A. 240.[9] In *Dupre* the court pointed out that the voting list was made up of an alphabetical list of the names of those persons who were qualified to vote together with the address of their residence so far as this information could be ascertained from the "registry book" and from such other evidence as the board might require in the case of any name appearing on the list. The court then went on to say that if a person wrote his name in the registry book and it appeared on

---

[9]The names invalidated in *Dupre* read somewhat like some of the names before us.

| Name on Voting List | Name on Nomination Paper |
|---|---|
| Plato Lee Bridges | P. Lee Bridges |
| Clemence V. Fonteyne | Mrs. C. V. Fonteyne |
| M. Eva Rondeau | Eva Rondeau |

the voting list as it was written in the registry book, it was not unreasonable to require such a person to sign his name in the same form when he signed a nomination paper. The statute in the *Stone* and *Dupre* cases was identical with the statute cited in *Clarke* and it remained unchanged until May 28, 1947.

On that day, the Governor approved the provisions of P. L. 1947, chap. 1886, better known as the direct primary law. Up to that time, the parties' candidates were chosen by a caucus or convention. One of the purposes of this legislation was to give the members of a political party a greater voice in the selection of party candidates and party officials. Section 10 of the new legislation read that "Every voter signing a nomination duplicate[10] shall sign in person with his name as it appears on the voting list and the place where he is then living, with the street number, if any * * *." The legislation was to take effect on July 1, 1948. Different primary days for each party were scheduled for September 1948. The State Board of Elections was empowered to make such rules as it deemed would promote the objects and purposes of the legislation and to render an annual report in writing to the General Assembly embodying any amendment it believes should be made to the act.

The state board made its first report to the Legislature in 1948 and, as a result, the new primary act underwent a thorough revision. This revision is known and cited as P. L. 1948, chap. 2100. That part of sec. 10 of the original

---

[10]The original direct primary act provided that, when the Secretary of State prepared a nomination paper, he would prepare an original and a "sufficient number of duplicates thereof." The act required the Secretary of State to retain the original and deliver the duplicates to the candidate or his duly authorized representative. When the act was revised in 1948, the reference to original and duplicates was deleted and the legislation speaks only of "nomination paper."

act dealing with the manner of signing nomination papers was revised to read exactly as §17-14-8 reads today.

In early June 1951, a limited constitutional convention was convened. The delegates approved a proposal calling for the amendment of the constitution which led to the establishment of a system of permanent registration of voters. On June 28, 1951, the electorate adopted art. XXIX —the Permanent Registration amendment. Before 1951, a voter who did not own any real or personal property was required to register with the local board of canvassers every two years.

Once the constitutional amendment was adopted, the Legislature met in special session and enacted P. L. 1951, Special Session, chap. 2870. This law, now chap. 9 of title 17, provided for a modern system of voter registration and required a complete new registration of all voters. Now, once a voter registers under this system, he need not re-register again unless his name be stricken from the list for one of the reasons in the statute, or unless he moves his home and residence to another municipality.

Under the new law, the local boards of canvassers were required to keep three registration records. A registration book which was in a bound form and contained the names of registered voters in the order in which they have registered, an original registration card, and a duplicate registration record. The original registration cards were to be maintained in an alphabetical file for each voting district and kept in specially constructed binders. The binders were to be sent to the polls on election day. The duplicate card was arranged alphabetically for an entire city or town.

In 1957, the Legislature authorized the establishment of a special commission which was charged with the responsibility of studying, revising and codifying all of the election laws of the state. The commission rendered its

report on November 1, 1957. The report contained numerous recommendations including the inauguration of a system of signature identification of the voter *at the polling place,* a same-day same-place primary election and a constitutional amendment to permit the shut-in or absentee to vote before election day. At that time, the voting lists contained the name and address of each registered voter and were made up from the information contained in the original registration cards on file with the local boards of canvassers.

The Election Laws Study Commission recommended that the use of the registry book be abandoned and the original permanent registration cards be used as the check list at the polls when determining the eligibility of persons seeking to vote. Many of the commission's recommendations were accepted by the General Assembly. In 1958, the election laws were again revised. P. L. 1958, chap. 18. Signature identification became part of the law. The Legislature, however, retained the requirement that a voter who signed a candidate's nomination paper affix thereto his name and residence as it appeared on the voting list. The Legislature in its effort to support the commission's proposal that the original registration records be used at the polling place provided that, whenever the term "voting list" was used in the new act, it meant the voter's original registration card.[11]

We think it most significant that the General Assembly, when it enacted and subsequently revised the direct primary act, has seen fit to adopt the standard first promulgated by judicial fiat in the *Clarke* case. This standard is now embedded in the statutory law of Rhode Island. The

---

[11]The new act permitted the discontinuance of the use of the registry book. The transcript of the hearing before the state board shows that the guide in determining the validity of the 124 signatures was the permanent registration cards.

language of §17-14-8 is clear and explicit: if a voter wishes to promote the candidacy of the person of his choice, he must then sign the nomination papers in the same form as his name appears on his permanent registration card. This court is duty bound to give due regard to the election laws of this state and give them full force and effect. The statute before us admits of no room for the doctrine of substantial compliance. To hold otherwise would result in its emasculation and could wreak havoc on our elective processes, especially as primary day approaches. It has been suggested that since the voter's signature is available for comparison with the signature on the paper, the requirements of the statute should be eased. This solution ignores the plain language of §17-14-8. The canvassers and their assistants, as they seek to meet the deadlines established in the primary law, are under no obligation to become handwriting experts. If the signature does not compare identically with the signature on the registration card, the canvassers need go no further. If the result appears to some to be harsh, the remedy is to be found in the state house not the courthouse.

The petition for certiorari is denied and dismissed, and the writ heretofore issued is quashed and the records certified to this court are ordered returned to the respondent board with our decision endorsed thereon.

Appendix to Opinion of the Court

Listed below is a random but somewhat representative sampling of the disputed signatures.

| Signature on Voting List | Signature on Nomination Papers |
| --- | --- |
| 1. Rocco Albanese, Jr. | Rocco Albanese |
| 2. Frederick J. Brown | Fred Brown |
| 3. Virginia B. Hollingworth | Virginia Hollingworth |
| 4. Richard J. Hughes | Richard John Hughes |
| 5. John J. Morris | John J. Morris, Jr. |
| 6. Elizabeth B. Feeney | Betty Feeney |

36

| 7. Madeline C. Todd | Mrs. John Todd |
| 8. Assunta Pieroni | Sue Pieroni |
| 9. N. Beatrice Jones | Beatrice N. Jones |
| 10. Elda M. Raftery | Mary Raftery |
| 11. Joseph R. Murray | J. Murray |
| 12. Helen Czorny | Helena Czorny |
| 13. James W. Kelley | James D. Kelley |

JOSLIN, J., dissenting. The key to this case is how G. L. 1956 (1969 Reenactment) §17-14-11 should be read. It is the only guideline to validation found in the election laws, and it directs the local canvassing authority "* * * to check all signatures, on each nomination paper, filed with it against the *voting list* as last canvassed or published according to law." (Emphasis supplied.) While it tells the canvassers *what* to check, it does not tell them *how* to check, and it is on the *how* that the majority and I disagree.

The majority, relying on *Attorney-General* v. *Clarke*, 26 R. I. 470, 59 A. 395 (1904), construe the §17-14-11 directive as requiring a letter-for-letter, initial-for-initial, abbreviation-for-abbreviation conformity between a voter's signature on a nomination paper and his name on the *voting list*. I would not be troubled by their construction if the *voting list*—the focal point of the entire validation process — had not been substantially altered from what it was when *Clarke* was decided. Then it was nothing more than a printed, typewritten or otherwise mechanically reproduced alphabetical list of the names and addresses of those eligible to vote. Today, it consists of original permanent registration cards signed by voters upon registration, and filed, together with the signed cards of other registrants residing in the same voting district, alphabetically or by street address, in permanent locked binders. G. L. 1956 (1969 Reenactment) §17-1-2(m).

The basic change in the character of the *voting list* occurred in 1958 when the Legislature completely revised our

election laws, P. L. 1958, chap. 18, sec. 1, now G. L. 1956 (1969 Reenactment) title 17. Hardly a section of the law was left untouched. The most significant revision was the adoption of a system of signature identification "as the only reasonably reliable method of identifying a voter." *Report of the Election Laws Study Commission of the State of Rhode Island* (1957) at 22.[1]

The signature identification system presupposes that a person's right to participate in the election process will hinge upon his being identified by a comparison of signatures. At the polls, for example, the statute provides that the right to vote, in the usual case, will depend upon whether a voter's signature on his application identifies him as the same person whose signature appears on the original permanent registration card. G. L. 1956 (1969 Reenactment) §17-19-24. This procedure bears little resemblance to that in effect prior to the adoption of signature identification. Then, a person's right to vote turned on whether the name and address he announced to the warden when he offered to vote could be found on the printed list of names and addresses. If it appeared, he was allowed to deposit his ballot; if he was missing, whatever the cause for the omission, permission was denied. *In Re The Polling Lists*, 13 R. I. 729.

The concern that a voter identify himself, however, does not depend upon whether the offer to participate is at the polls or at the nomination stage of the election process. In either case, the interest to be protected is identical. It is to insure, by the best available method, that the person who offers to participate is the person he represents himself to be. The *voting list* is the only common point of refer-

---

[1]The Commission was constituted by Resolution No. H. 1036, Substitute A, January Session, 1957, and was charged with the power and duty "of studying, revising and codifying all of the election laws of the State of Rhode Island."

ence provided by the election laws for determining whether he is that person. While the printed name on yesterday's *voting list* was obviously an inadequate standard against which to check either identity at the polls or the validity of a signature on a nomination paper, the then election laws did not offer the option of a better alternative. That is no longer true. Today we have locked binders containing registration cards bearing the signatures of all qualified electors, and either at-the-polls identification or the authenticity of a signature on a nomination paper is readily ascertainable by reference to those cards. With the change in the *voting list*, the need as well as the reason for the rule of exact conformity vanished.

Under today's law, the canvassers, when engaged in the validation process, have before them for visual examination two signatures: one on a nomination paper, the other on an original permanent registration card. Their purpose is to certify only authentic and valid signatures of qualified party electors,[2] and §17-14-11 specifically provides that "forged" signatures shall not be counted.[3] It is unthinkable

---

[2] The original permanent registration card, in addition to containing a voter's signature and address, makes provisions for recording the fact that he may have voted at an election or signed caucus, primary or final nomination papers. G. L. 1956 (1969 Reenactment) §17-9-6. And as a part of the validation process, the canvassers look to the cards, not only to verify signatures, but also to ascertain whether a signature on a nomination paper shall be disqualified by reason of the voter's having within 26 months voted in a primary election as a member of any other political party, or signed final nomination papers of any candidate for any elective office, or signed primary nomination papers for candidates of any other political party. G. L. 1956 (1969 Reenactment) §17-15-24.

[3] In pertinent part §17-14-11 reads:
"* * * if any candidate or the chairman of any party committee questions the *validity* or *authenticity* of any signature on such nomination paper, the local board shall forthwith and summarily decide the question, and for this purpose, shall have the same powers as are conferred upon the board by the provisions of §17-14-14, if any signature is found to be *invalid,* for any reason in law, or *forged,* then such signature shall not be counted." (Emphasis supplied.)

to me that in the course of their visual examination the canvassers should intentionally blind themselves to signature likenesses or differences and look at the two signatures for the limited purpose of ascertaining whether one is a letter-for-letter, initial-for-initial, abbreviation-for-abbreviation duplicate of the other. To thus restrict their examination is to permit the validation of a signature which conforms, but does not compare. This to me is an unacceptable anomaly.

Reason and reflection convince me that election machinery, which is keyed to voter identification based upon signature comparison, could not possibly contemplate that the canvassers should ignore the new standard when they pass upon the validity of a signature on a nomination paper. To accept, in these circumstances, the rule of exact conformity as the only standard for validation is to accept a rule which is based upon the fiction that a voter signing a nomination paper will presumptively sign his name letter-for-letter, initial-for-initial, abbreviation-for-abbreviation exactly as he may have signed it at sometime in the past. Acceptance also overlooks the reality that the same person might, for example, sign a registration card as "John James Jones" and years later sign a nomination paper as "John J. Jones."[4] While exact conformity may have been valid as a rule of expediency when the printed list of names and addresses was the only measuring stick against which

[4]See Appendix of the majority opinion which lists a sampling of the kind of discrepancy between signatures which resulted in their being refused validation. In each of these instances, as in each of the remaining 149, Malinou in his petition for a writ of certiorari alleged that the signature on the voting list was that of the same person who signed his nomination papers. The Board of Elections does not dispute that allegation and it is, therefore, under the prevailing practice, accepted as true *Morin* v. *Zoning Board of Review*, 102 R. I. 457, 460, 232 A.2d 393, 394; *Wyss* v. *Zoning Board of Review*, 99 R. I. 562, 564, 209 A.2d 225, 226; *Roberts* v. *Board of Elections*, 85 R. I. 203, 207, 129 A.2d 330, 333.

the canvassing authority could check a signature on a nomination paper, it lost its viability when signature comparison became available as a precedent to voter participation, and when, as an integral part of the signature identification system, a *voting list* became a collection of specimen signatures.

I read §17-14-11 as a directive to the canvassing authority to verify voter identity by comparing the signatures on nomination papers with those on the registration cards. To read it otherwise is to disregard the rule of statutory construction which says that legislative intention is found by looking at the pertinent legislation in its entirety and by viewing it in the light of the purpose which motivated its enactment. *Shulton, Inc.* v. *Apex, Inc.,* 103 R. I. 131, 134, 235 A.2d 88, 90. I am aware that G. L. 1956 (1969 Reenactment) §17-14-8 tells the voter who signs a nomination paper to "* * * sign in person with his name, place of residence and street number, if any, as it appears on the voting list * * *." I refuse, however, to read that provision as making disqualification the price for failure to comply literally. Such a reading completely ignores an election system which is based on signature identification, and which could, as in this case, result in the unnecessary invalidation of the authentic signatures of qualified party electors. I cannot believe that the Legislature intended so unreasonable a result and I, therefore, do not construe §17-14-8 as mandatory. *Wilkinson* v. *Harrington,* 104 R. I. 224, 243 A.2d 745; *Genereux* v. *Pelosi,* 96 R. I. 452, 192 A.2d 630; *State* v. *Haggerty,* 89 R. I. 158, 151 A.2d 382.

Here, Malinou's nomination papers endorsed with more than 1,000 names came to the Board of Elections for certification. It certified 873 of the names thereon as those of qualified electors of the Democratic Party; rejected 124 because the endorsers had not subscribed their names on

the nomination papers in the identical form and manner as they had signed their original permanent registration card; and invalidated 25 others because the endorsers had indicated on the nomination papers places of residence and/or street numbers differing from those appearing on their original permanent registration cards.[5] The Board of Elections admits that the signatures invalidated are those of qualified electors of the Democratic Party and, after comparing them with the signatures on the original permanent registration cards, does not dispute either their validity or authenticity. Notwithstanding, it applied the rule of exact conformity and refused to validate. In my judgment this was error. Those 149 endorsements should have been certified. Malinou's papers would then carry the signatures of more than enough qualified electors of the Democratic Party to entitle him to listing as a candidate for that Party's nomination for the office of United States Senator.

*Martin S. Malinou,* petitioner, pro se.

*Moore, Virgadamo, Boyle & Lynch, Salvatore L. Virgadamo, Francis J. Boyle, Laurent L. Rousseau; Maurice W. Hendel, Stephen F. Achille, John Quattrocchi, Jr., Herbert F. DeSimone,* Attorney General, *W. Slater Allen,* Assistant Attorney General, for respondents.

---

[5]Following the example of the majority I list a random, but somewhat representative, sampling of the differing addresses.

| Address on voting list | Address on nomination papers |
| --- | --- |
| 68 Pekin | 21 Pekin |
| 239 Jewett St. | 237 Jewett St. |
| 305 Williams | 229 Williams |
| 89 Wesleyan Ave. | 79 Wesleyan |
| 12 Armstrong | 14 Armstrong |
| 30 Douglass Avenue | 54 Goddard |
| 49 Hillside Ave. | 12 Ogden St. |