**Gloria C. DAHL et al.**

v.

**Roger N. BEGIN et al.**

**No. 95–173–M.P.**

Supreme Court of Rhode Island.

July 18, 1995.

Joseph J. McGair, Warwick, John Austin Murphy, Jamestown, for plaintiffs.

Anthony J. Bucci, Jr., Bd. of Elections, Henry V. Boezi, III, Kathrin J. Pagonis, Bernard A. Jackvony, Tillinghast, Collins & Graham, Providence, for defendant.

## OPINION

WEISBERGER, Chief Justice.

This case came before a hearing panel of this court for oral argument on April 18, 1995, pursuant to an order that had directed all parties to appear and show cause why the issues raised by this petition for certiorari should not be summarily decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, this court concluded that cause had not been shown and issued an order summarily deciding the issues raised by the petition with the indication that an opinion would follow setting forth the reasons for said order.

In that order we granted the petition for certiorari, quashed the decision of the State Board of Elections, and affirmed an earlier decision of the Jamestown Board of Canvassers that accepted nominations for town offices filed by the Democrat State Committee. The facts of the case insofar as pertinent to this petition for certiorari are as follows.

The town of Jamestown scheduled a general election for said town to be conducted on May 3, 1995. The election was to include members of the town council, members of the school committee, and the town moderator. Instructions were given by the board of canvassers that the deadline for nomination papers would be March 6, 1995 at 4 p.m.[1] It is

---

1. Attorneys for petitioners challenge the correctness of this date, but in light of our disposition of the issues in respect to the petition, we shall

undisputed that the Democrat Party candidates did not meet the required deadline although the Republican Party candidates and an independent candidate did meet this deadline.

At a meeting of the board of canvassers which was held March 13, 1995, the board refused to certify the Democrat candidates but did accept a slate of Democrats for all positions that had been designated by the Democrat State Committee and signed by the chairman of the Democrat State Committee. This slate named each of the original Democrat candidates for the position sought in the townwide election. The board of canvassers accepted this slate on the same date and certified the list to the Secretary of State.

On March 17, 1995, the chairperson of the Republican Town Committee for the Town of Jamestown appealed to the State Board of Elections, challenging the decision of the board of canvassers. On Friday, March 24, 1995, the State Board of Elections in a "bench decision" held that the Jamestown Board of Canvassers had erred and instructed the Secretary of State to omit the names of the candidates of the Democrat Party from the election ballot. This had the effect of leaving only the Republican candidates and one independent candidate to be set forth on the ballot on election day.

From this decision of the board of elections, petitioners, all of whom were candidates for town offices from the Democrat Party, petitioned for review by certiorari. This court issued its writ and instructed all parties to appear for oral argument on April 18, 1995. Our order followed, and this opinion sets forth the reasons for said order.

■ The petitioners contend that clear authority is contained in G.L.1956 (1988 Reenactment) § 17–12–2 for the state committee to make a final nomination for any local office for which no nomination has been made. This statute reads as follows:

"Composition and powers of state committees.—The state committee of a political party shall be composed as determined by the party. It shall have (1) general

oversight of all conventions of its party; (2) power to make rules not inconsistent with law for the guidance and control of all the political committees of its party; (3) *power to make a final nomination for any state office for which no primary nomination has been made and any local office for which no nomination has been made by any authorized city, town, ward, or district committee or any duly authorized subcommittee;* and (4) power to fill vacancies in its own membership and as provided in chapter 15 of this title." (Emphasis added.)

■ Our reading of subsection (3) of § 17–12–2 clearly indicates to us that the state committee is granted the power that it purported to exercise in this instance. It is well-settled doctrine that when a statute is unambiguous and expresses a clear and sensible meaning, the work of construction is at an end and this meaning will be implemented in accordance with the plain language set forth. *See, e.g., State v. Powers,* 644 A.2d 828, 830 (R.I.1994); *Kirby v. Planning Board of Review of Middletown,* 634 A.2d 285, 290 (R.I. 1993); *Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1057 (R.I.1991); *O'Neil v. Code Commission for Occupational Safety and Health,* 534 A.2d 606, 608 (R.I. 1987); *Moore v. Rhode Island Share and Deposit Indemnity Corp.,* 495 A.2d 1003, 1004 (R.I.1985). In the case at bar, the authority given to the state committee to make a final nomination for any local office for which no nomination has been made by any authorized city, town, ward, or district committee, or any duly authorized subcommittee, could not be more plain and unambiguous.

Nevertheless, the board of elections seemed to place emphasis upon the repeal of a prior statute that had also purported to give state committees the power to fill vacancies. That statute was G.L.1956 (1981 Reenactment) § 17–14–17.1, as amended by P.L. 1983, ch. 243, § 1, § 12, which was repealed by P.L.1987, ch. 389, § 7. The repeal of this statute became effective in 1988. There is no question that the repealed statute contained

assume without deciding that the board of canvassers selected the correct date.

comprehensive directions for the filling of vacancies among candidates in respect to both general and special elections. However, the repeal of this statute did not affect the vitality or validity of § 17–12–2.

■ It is not possible for this court to determine the intent of the General Assembly in repealing one statutory provision that allowed for the filling of vacancies among candidates by the state committee and at the same time allowing another statute with similar effect to remain intact.[2]

The principal concern of this court is not the candidates who have missed a critical date in the nomination process but the voters of the town of Jamestown who should if at all possible have a choice among candidates endorsed by the major political parties. Any attempt to disenfranchise those voters of the town who might prefer the adherents of one particular major party over those of another would require the clearest and most specific of expression of intent on the part of the Legislature. It should also be noted that any such intentional disenfranchisement would raise serious constitutional issues and might well be subject to strict judicial scrutiny.[3]

■ In any event the plain language of § 17–12–2(3) precludes the necessity for our construing any such intent on the part of the General Assembly. We shall not reach a

constitutional issue unless and until it is absolutely necessary to do so.

The petitioners have raised questions concerning the standing of the members of the Republican Town Committee to challenge the decision of the Jamestown Board of Canvassers. It is disputed concerning whether some of the respondents may have appealed from the board of canvassers in their capacity as voters as opposed to their capacity as members of the Republican Town Committee. We shall assume, without deciding, that they did have standing to invoke the jurisdiction of the board of elections.

For the reasons stated, the petition for certiorari was granted in our order dated April 20, 1995. The decision of the board of elections was quashed, and the decision of the Jamestown Board of Canvassers accepting nominations for town offices filed by the Democrat State Committee was affirmed.

The papers in this case may be remanded to the State Board of Elections with our decision endorsed thereon.

SHEA and BOURCIER, JJ., did not participate.

LEDERBERG, Justice, dissenting.

I am of the opinion that the state committees of political parties do not have the statu-

---

2. Our colleague, Justice Lederberg, quotes from a special legislative commission report that explains the reasons for the repeal of G.L.1956 (1981 Reenactment) § 17–14–17.1, as amended by P.L.1983, ch. 243, § 1. The report does not explain the reason for leaving G.L.1956 (1988 Reenactment) § 17–12–2 in full force and effect. The commission reports that candidates should genuinely intend to be candidates and that filings and withdrawals which amount to political games and serve no public purpose should be discouraged. Certainly in the case at bar the candidates were sincere and serious. The fact that they missed a filing deadline by one day was surely due to inadvertence and not in any way to bad faith or lack of sincerity.

In any event, we have relied upon the clear language of § 17–12–2(3). The General Assembly did not repeal this statute. Our colleague suggests that the State Board of Elections may have regarded this statute as having been repealed by implication and that no vacancy should be filled save in accordance with G.L. 1956 (1988 Reenactment) § 17–15–38, as amend-

ed by P.L.1991, ch. 173, § 1. Repeal by implication is disfavored by the law and is not lightly to be construed. See, e.g., Blanchette v. Stone, 591 A.2d 785, 786–87 (R.I.1991); State ex rel. Thompson v. DeNardo, 448 A.2d 739, 740 (R.I.1982) (citing Berthiaume v. School Committee of Woonsocket, 121 R.I. 243, 248, 397 A.2d 889, 893 (1979)). It is undisputed that regardless of the opinion of the commission, the General Assembly in the exercise of its plenary power did not repeal § 17–12–2.

3. Our colleague is unimpressed with the concept of disenfranchisement of voters who may desire to vote for members of a major political party. Without denigrating the role of independent candidates, it is nevertheless of significant importance that the adherents of major political parties be given an opportunity to select candidates of their choice. The right to refrain from voting at all or to write in the name of a candidate is scarcely a substitute for the ability to select such a candidate whose name has been placed upon the ballot.

tory authority to nominate, after the filing deadline, candidates for office except in the event of the death, removal from the jurisdiction, or disability of a nominee subsequent to a primary election. Because none of these circumstances obtained in the instant case, the petition for certiorari should have been denied.

Prior to June 1, 1988, Rhode Island had in place precisely the mechanism that the majority claims is embodied in G.L.1956 (1988 Reenactment) § 17–12–2(3). General Laws 1956 (1981 Reenactment) § 17–14–17.1, as amended by P.L.1983, ch. 243, § 1 provided in pertinent part:

> "Filling vacancy upon failure to qualify.—In the event no one qualifies for an office to be voted upon at any such primary, the state committee of that party or a duly authorized subcommittee thereof in the case of state officers and the appropriate city, town, ward or district committee or any duly authorized subcommittee thereof in the case of candidates for the other offices covered by Section 17–15–7, may file with the appropriate authority provided by chapter 17 of this title the name of its nominee for said office * * *."

Contrary to the statement in the majority's opinion that it is not possible to determine the intent of the General Assembly evidenced by its repeal of this statute, there exists in this instance clear documentation of the legislative intent that served as the basis for the State Board of Elections' decision. In 1987 a special legislative commission reported on the length of the election process in Rhode Island and addressed the then-existing practice of withdrawals and filling of vacancies. The report stated:

> "The Commission feels that the labyrinthian provisions of the present law providing for withdrawals and filling of vacancies at various stages of the election process have no legitimate purpose. Candidates should genuinely intend to be candidates and filings and withdrawals amount to political games and serve no public purpose. All these provisions in the election law, except one, should be eliminated. The only provision that should remain is the provision for filling of vacancies in the case

of a candidate's death, incapacity, or moving from the district." *Report of the Commission to Study the Length of the Election Process,* 3–4 (January 27, 1987).

After the commission released its report and after legislation was submitted to implement its recommendations, the General Assembly repealed § 17–14–17.1 on July 1, 1987, to be effective June 1, 1988. P.L.1987, ch. 389, § 7, § 12. *Since that date, the State Board of Elections (board) has upheld the Legislature's intent by not allowing state committees to fill the nominations for an office after the local committee has failed to do so in a timely fashion unless the vacancy resulted from the death, absence from the jurisdiction or disability of the original nominee.* The majority's opinion reverses seven years of consistent implementation of that intent by the board and instead introduces uncertainty and disruption into the election process.

The circumstances in which a state committee may appoint a candidate are clear. General Laws 1956 (1988 Reenactment) § 17–15–38, as amended by P.L.1991, ch. 173, § 1, provides in pertinent part:

> "**Vacancies among nominees.**—Whenever the nominee of a party for a particular office dies after the primary or removes him or herself from the jurisdiction of or as a candidate for the office for which the nominee seeks election or becomes physically or mentally disabled, the state committee of that party or a duly authorized subcommittee thereof in the case of state officers, and the appropriate city, town, ward, or district committee or any duly authorized subcommittee thereof in the case of candidates for the other offices covered by § 17–15–7, may file with the appropriate authority the name of its nominee for the office * * *."

Since the repeal of § 17–14–17.1, the board has not permitted state committees to make nominations for an office upon the failure of candidates of their parties to file or to qualify for public office. The General Assembly, in its repeal of § 17–14–17.1, has made clear that vacancies may be filled only in the event of the extraordinary circumstances listed in § 17–15–38.

Basic to the rules of statutory construction is the principle that statutes affecting related subjects should be interpreted to provide consistency (*In re Falstaff Brewing Corp.,* 637 A.2d 1047, 1051 (R.I.1994)) and to effectuate the purposes intended by the Legislature. *Nascimento v. Phillips Petroleum Co.,* 115 R.I. 395, 346 A.2d 657 (1975). The ruling of the State Board of Elections clearly accomplished these objectives. Section 17–12–2(3) must be read together with § 17–15–38. This court assumes that the Legislature intended that statutes *in pari materia* be construed together to be consistent and to effectuate the policy of the law. *Rhode Island State Police Lodge No. 25 v. State,* 485 A.2d 1245, 1247 (R.I.1984). When these statutes are interpreted together, it is apparent that § 17–12–2(3) addresses the filing of a nomination by the state committee of a political party *before* the nomination deadline, whereas § 17–15–38 addresses the filing of a nomination when certain specific events occur *after* the deadline. To hold, as the majority does, that § 17–12–2(3) permits the filing of a nomination after the deadline has passed, is to make § 17–15–38 surplusage, inasmuch as a state committee, according to the majority, would already possess the powers listed in that statute. The majority has in effect transmogrified § 17–12–2(3) into the repealed § 17–14–17.1. The plain language of § 17–12–2(3), however, does not permit a state committee to make such appointments beyond the deadline established by the board pursuant to its statutory authority under G.L.1956 (1988 Reenactment) § 17–14–11, as amended by P.L.1991, ch. 277, § 2. Section 17–12–2(3) merely authorizes a state committee to make nominations for any local office for which no nomination has been made. Section 17–12–2(3) does not permit a state party to step in and make nominations after the established deadline, nor does it grant the power to fill vacancies, as § 17–14–17.1 had done. In the case at bar, the nominations *were* made, but they were not timely and hence were not certified to the Secretary of State's office.

The majority's stated "principal concern" that voters of the town of Jamestown would be "disenfranchised" unless presented with a "choice among candidates endorsed by the major political parties" is far from convincing. For many years, substantial numbers of offices in general elections have not offered voters a "choice" of candidates from the "major" parties. Moreover, because an independent candidate for President in 1992 garnered 23 percent of the Rhode Island votes for President and a Cool Moose Party candidate for Governor in 1994 won 9 percent of the vote, the majority's implication that only Democratic and Republican candidates qualify for consideration as candidates of a "major party" fails to recognize recent electoral history and raises the spectre of an "equal protection" melee among the parties in their scramble for placement on the ballot.

In any case, the voters of Jamestown have not been "disenfranchised." Any rights that arguably may be at stake are not those of the voters but of the rejected candidates, who might claim that their rights to candidacy were infringed. Courts, however, have generally upheld requirements for candidacy such as filing deadlines and the collection of nominating signatures.[1] Jamestown voters are clearly not disenfranchised by having only one candidate for certain offices, an occurrence that is frequent in Rhode Island elections. The voters may vote for a listed candidate, may write in a candidate of their choice, or may not vote for *any* candidate, irrespective of the number of candidates for a given office.

This is not a case of deciphering a "legislative intent to disenfranchise voters," clearly an unconstitutional result. Rather, this is a case in which the Legislature set forth minimal requirements for candidacy for office which a group of candidates failed to meet.

In its ruling today, the majority returns the voters of Rhode Island to a time when "filings and withdrawals amount[ed] to political games and serve[d] no public purpose." *Report of the Commission* at 3. The majori-

---

**1.** The majority opinion does not distinguish between the requirement to meet a filing deadline and the failure to gather the requisite number of signatures on nomination papers, or to comply with any of the rules for candidacy—rules with which the failure to comply obligatorily leads to a similar "disenfranchisement."

ty's holding will allow a state committee to place a name on the ballot at any time before an election—a day, a week, a month or an hour. Any semblance of predictability or stability in the election system has been destroyed. Candidates with whom the voters are unfamiliar can suddenly appear on the ballot, at any time, in a ghostly fashion, with no forewarning and at the whim of a state committee or, practically speaking, the party chair. The majority's *de facto* resurrection of § 17–14–17.1 in the form of the transmutated § 17–12–2(3) is an invitation to Democratic, Republican, Independent and other parties' state committees to ignore filing deadlines and attempt to gain as much political advantage as possible by manipulating the nominating process. The General Assembly had created strict and explicit rules to avoid such occurrences. Unfortunately, the majority rejects the Legislature's considered decision and instead substitutes its own view of how the process should take place.

In *Malinou v. Board of Elections,* 108 R.I. 20, 26, 271 A.2d 798, 801 (1970), this court pointed out that "The Rhode Island constitution vests in the General Assembly the exclusive jurisdiction over the manner of conducting elections." After recognizing this constitutional authority, the court concluded:

"This court is duty bound to give due regard to the election laws of this state and give them full force and effect. * * * If the result appears to some to be harsh, *the remedy is to be found in the state house not the courthouse.*" (Emphasis added.) *Id.* at 35, 271 A.2d at 805.

The Democrats' unfortunate lapse in handing their papers to the Clerk of the Board of Canvassers for the Town of Jamestown before 4:00 p.m. on March 6, 1995, made that party slate ineligible in the 1995 election. Denial of candidacy is a harsh result, but this court should not rewrite the state election laws in order to grant absolution. As this court has pointed out, forgiveness should be found at the State House where the Legislature has the legitimate authority to remedy the candidates' plight.

Therefore, I respectfully dissent with respect to the majority's interpretation of § 17–12–2(3), although I concur with its assumption that the members of the Republican Town Committee had standing to invoke the jurisdiction of the board.