**Melvyn M. GELCH**

v.

**STATE BOARD OF ELECTIONS et al.**

**Nos. 84–320–M.P., 84–330–M.P.**

Supreme Court of Rhode Island.

Oct. 19, 1984.

**1206**

Steven E. Snow, Tillinghast, Collins & Graham, Providence, for plaintiff.

Keven A. McKenna, John A. O'Neill, Jr., Frank A. Mastrati, Jr., Providence, for Bd. of Elections.

Ronald W. DelSesto, Providence, for Secretary of State's Office.

## OPINION

SHEA, Justice.

This case is before the court following the consolidation of two petitions for writ of certiorari. The petitioner, Melvyn M. Gelch (Gelch), seeks a review of two decisions of the State Board of Elections certifying Vincent A. Cianci, Jr. (Cianci), as a qualified candidate in the special mayoral election. The special election was being held to fill the unexpired term of the office of mayor that was forfeited when Cianci, the incumbent mayor, was convicted of a felony. We hold that according to the Providence Home Rule Charter of 1980 (charter), when the office is vacated because the incumbent is convicted of a felony, the entire four-year term of office must be vacated, thereby prohibiting the incumbent from seeking to fill the unexpired portion of the term.

I

On April 23, 1984, Cianci was convicted of the felony of assault with a dangerous weapon after pleading nolo contendere in the Superior Court. He was sentenced to five years at the Adult Correctional Institutions (ACI). The execution of the sentence was suspended, and Cianci was placed on probation for five years. On April 25, 1984, Cianci resigned the office of mayor of Providence and the city council declared the office vacant pursuant to § 206(a) of the charter.

Cianci filed with the Providence Board of Canvassers a declaration of his candidacy and his nomination papers for the office of mayor of Providence for the special election to fill the unexpired term from which he resigned. Gelch objected to Cianci's candidacy before the board of canvassers pursuant to G.L. 1956 (1981 Reenactment) § 17-16-16. Gelch's objection was based on G.L. 1956 (1981 Reenactment) § 13-6-2, a state law that deals with the loss of civil rights by persons sentenced to imprisonment for more than one year. The board of canvassers denied the objection and certified Vincent A. Cianci, Jr., a qualified candidate for the special mayoral election. Gelch appealed this decision to the State Board of Elections.

The board of elections affirmed the decision of the board of canvassers. Gelch filed a petition for writ of certiorari with this court, seeking a review of the state board's decision. Gelch subsequently amended his earlier objection with the board of canvassers to include an argument based on the charter.

The board of canvassers declined to rule on the applicability of § 206 of the charter, claiming that it lacked jurisdiction. Gelch then took a second appeal to the board of elections.

The board of elections ruled that Cianci was an eligible candidate under the charter. Gelch filed a second petition for writ of certiorari with this court, requesting a review of the second decision of the board of elections. On June 25, 1984, this court entered an order issuing writs of certiorari, consolidating them for hearing, and staying the special election until July 31, 1984.

After hearing arguments, an order of this court was entered declaring Cianci ineligible to be a candidate in that special election. *Gelch v. State Board of Elections*, Nos. 84–320–M.P. and 84–330–M.P. (R.I., filed July 6, 1984). We now write to detail our reasoning.

Gelch first claimed that the United States Constitution allows the state to

place qualifications on a convicted felon's right to hold public office. He then asserted that Rhode Island's Constitution merely sets minimum qualifications on a person's right to hold public office, thereby allowing the General Assembly to establish further qualifications. Finally, Gelch asserted that the charter requires that the entire four-year term of office be vacated when an incumbent is convicted of a felony, making Cianci an ineligible candidate in the special election being held to fill his unexpired term.

## II

■ A threshold issue is whether Gelch has standing to object to Cianci's candidacy. He contends that as a qualified elector in the city of Providence he has standing pursuant to § 17–16–16. This statute provides for the filing of "written objections * * * to the eligibility of the candidate * * *." A reasonable interpretation of this statute is that qualified electors of Providence have standing to object to a candidate's eligibility. This conclusion is reached in light of this court's past holdings conferring standing liberally when matters of substantial public interest are involved. *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, R.I., 452 A.2d 931, 933 (1982). We conclude that petitioner Gelch has standing to object to Cianci's eligibility as a candidate.

## III

### A

### FEDERAL CONSTITUTION

■ States have the discretion to establish certain conditions under which the right of suffrage may be exercised and the right to hold public office determined. *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072, 1076 (1959). This power of the state, of course, must be exercised within the bounds of the Federal Constitution. It must be free of the discrimination that the United States Constitution condemns.

■ Limitations on the right of a person who has been convicted of a felony to vote and to hold public office have been explicitly recognized by the United States Supreme Court. *Richardson v. Ramirez*, 418 U.S. 24, 54, 94 S.Ct. 2655, 2671, 41 L.Ed.2d 551, 571 (1974). The Court in *Richardson* noted that whereas the equal-protection clause puts many inhibitions on the power of the state to limit the franchise, section 2 of the Fourteenth Amendment to the United States Constitution expressly allows the states the power to disenfranchise convicted felons.[1] The Court held that the disenfranchisement of a convicted felon by the state need not undergo the typical equal-protection analysis that other qualifications on the right to vote and to hold public office must undergo under section 1 of the Fourteenth Amendment because of the express exception contained in section 2. A decision by the state therefore to disenfranchise a person or to disqualify a person who has been convicted of a felony from seeking public office does not violate the equal-protection clause of the Federal Constitution.

■ Cianci claimed that his First Amendment rights would be violated by denying

---

1. Section 2 of the Fourteenth Amendment to the United States Constitution states:

 "Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for president and vice president of the United States, representatives in congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state." (Emphasis added.)

him access to the ballot, thereby requiring the state to prove a compelling interest to warrant the denial. U.S. Const. amend. I. Although it is clear that the candidacy for public office is one of the rights included within the scope of the First Amendment of the United States Constitution, *Cummings v. Godin*, 119 R.I. 325, 335, 377 A.2d 1071, 1076 (1977), the disqualification of a convicted felon by a state is specifically allowed under section 2 of the Fourteenth Amendment. The First Amendment, only applicable to the states through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145 (1925), therefore gives Cianci no further protection than that established by the Fourteenth Amendment. We find, therefore, that his claim of a First Amendment violation is without merit.

B

STATE CONSTITUTION

Cianci contended that Rhode Island's Constitution bars any legislative restriction on the right of a citizen to be a candidate for public office beyond the constitutional requirement that all candidates be qualified electors. This contention cannot be sustained.

Shortly after the turn of the century, this court in *Payne & Butler v. Providence Gas Company*, 31 R.I. 295, 316–17, 77 A. 145, 154 (1910), pointed out that a state constitution, unlike its federal counterpart, does not constitute a grant of enumerated powers to the State Legislature. Instead, a state constitution merely acts as a limitation "upon the complete power with which the legislative department of the state was vested in its creation." Thus, in dealing with the Federal Constitution, one searches for a grant of legislative power. However, when a state constitution is in issue, the search is centered on the presence, if any, of a constitutional limitation on the legislative power. Such a limitation must be "created and imposed by express words or arise by necessary implication." *Id.* at 317, 77 A. at 154. Similar sentiments have been

expressed in *Nugent v. City of East Providence*, 103 R.I. 518, 525, 238 A.2d 758, 766 (1968), and *Henry v. Cherry & Webb*, 30 R.I. 13, 29–30, 73 A. 97, 104 (1909). The relevant constitutional provision in this case is article XXXIX of the amendments to the Rhode Island Constitution, which provides: "No person shall hold any civil office unless he be a qualified elector for such office."

This article of amendment, adopted by the electorate in November 1973, replaced section I of article IX, which had been a part of the state's constitution since its adoption in 1842. Section I had specified that "no person shall be eligible to hold any civil office (except the office of school committee) unless he be a qualified elector for such office." The parenthetical phrase, "except the office of school committee," written prior to women's suffrage, permitted women to hold office only on the school committee. With women's suffrage, this parenthetical phrase became mere surplusage. The phrase was finally eliminated in 1973 with the adoption of article XXXIX.

Article XXXIX of the amendments to the Rhode Island Constitution was adopted following the conclusion of a limited constitutional convention held pursuant to P.L. 1973, ch. 98. In *Bailey v. Baronian*, 120 R.I. 389, 392–93, 394 A.2d 1338, 1340 (1978), we noted that the 1973 convention dealt with four areas of concern, one of which was the revision of the election laws. In the *Bailey* case we referred to comments made by various delegates once the so-called suffrage proposal emerged from the committee on elections to the floor. As a result of the exchange on the floor, the proposal was referred back to committee and later reemerged reflecting the changes suggested by two delegates. Here also, in determining the reach of article XXXIX, we shall refer to the activities of the 1973 Constitutional Convention.

On September 12, 1973, proposal 7 was presented. It was entitled "Qualification for Office" and was referred to the Com-

mittee on Elections.[2] Subsequently, on September 25, 1973, the committee presented proposal 7 in its original form to the full committee. In explaining the proposal, the chairman of the Committee on Elections remarked, "[W]hat this does Mr. Chairman, very simply, is drop the parenthetical expression contained in article IX, section 1 which said originally, 'no person shall be eligible for any civil office (except the office of school committee) unless he is qualified and elected to such office.'" The chairman further explained that the 1842 provision preeeded women's suffrage and had permitted women to serve on municipal school committees. After this explanation the proposal was referred unanimously to the convention's Committee on Style and Drafting.[3] On October 2, 1973, the committee, through its chairman, brought proposal 7 to the floor and moved its passage. In doing so, the chairman told delegates that in adopting this provision "clearly the intent in mind is that a person who is outside his ward or district shall not hold office."[4] It is clear that at no time did the drafters of the proposal that was ultimately adopted as article XXXIX ever contemplate the eligibility of a public officer, such as Cianci, to seek election for the unexpired portion of his term after having forfeited that office as a result of a felony conviction. In fact, the only specific provision of the constitution purporting to deal with the disqualification of a public official is to be found in section 2 of article IX, which disqualifies an individual "from holding any office to which he may have been elected if he be convicted of having offered, or procured any other person to offer, any bribe to secure his election, or the election of any other person."

Nothing in article IX or XXXIX purports in any way to limit or restrict the plenary power of the Legislature to prescribe any other qualifications or disqualifi-cations or conditions for the holding of public office. The General Assembly has exercised this power to establish reasonable requirements on a candidate's ability to gain access to the ballot. Candidates for office must be registered to vote thirty days prior to filing a declaration of candidacy. *Conrad v. Narragansett Board of Canvassers*, R.I., 420 A.2d 50, 52 (1980); *Rawlinson v. Board of Canvassers*, R.I., 420 A.2d 52, 53 (1980). Declarations of candidacy must be filed within established time limits. General Laws 1956 (1981 Reenactment) § 17–14–1, as amended by P.L. 1983, ch. 58, § 1 and § 17–16–1, as amended by P.L. 1983, ch. 58, § 2. Nomination papers must be submitted containing the required number of valid signatures of eligible voters. Section 17–14–7, as amended by P.L. 1982, ch. 160, § 1 and § 17–16–8, as amended by P.L. 1982, ch. 160, § 2. All of these requirements represent additional reasonable qualifications established by the General Assembly for a person to become an eligible candidate. Consequently, the General Assembly was well within its inherent power, unrestricted by constitutional limitations, when it ratified and adopted the provisions set forth in the Providence city charter of 1980.

## C

### PROVIDENCE HOME RULE CHARTER OF 1980

In 1981 the General Assembly ratified and enacted the Providence Home Rule Charter that had been approved on November 4, 1980, by the voters in the city of Providence in accordance with article XXVIII of amendments to the Rhode Island Constitution. The General Assembly thereby enacted certain provisions of the charter that limited the right of a convicted felon to continue to hold public office.

---

2. Journal of the 1973 Constitutional Convention, vol. 1, no. 3, p. 5.

3. Journal of the 1973 Constitutional Convention, vol. 1, no. 6, p. 6.

4. Journal of the 1973 Constitutional Convention, vol. 1, no. 8, pp. 3, 23.

Gelch argued that according to the charter Cianci was ineligible to fill the vacancy created in the remainder of the term to which he was elected and which he subsequently forfeited. According to his interpretation of the charter, the four-year term of office is part of the office of mayor that Cianci forfeited. When he forfeited the office, Gelch asserted, Cianci forfeited it for the full four-year term and therefore cannot be reelected to that term. Cianci's position was that he was an eligible mayoral candidate because the charter contains no provision that expressly disqualified him from the special election. Alternatively, Cianci argued that the vacancy created a new term of office for which he was a qualified candidate. Finally, Cianci contended that the voters would be denied their right to vote for or against him if he were declared ineligible.

Sections 202 and 206 of the charter are pertinent to an analysis of the issue of Cianci's eligibility to run for mayor. Section 202, which deals with the date of election and the terms of office, states:

"The mayor * * * shall * * * be elected for a term of four (4) years at a general city election to be held on the Tuesday next after the first Monday in November, A.D. 1982, and each fourth year thereafter. * * * The term of office of the mayor * * * shall begin on the first Monday in January next following * * * [his or her] election, and * * * [he or she] shall hold office until his or her successor is elected and qualified; provided, however, that no such office becomes vacant before the end of the term * * * pursuant to section 206 of this article."

Section 206(a) deals with vacancies in elective offices and states that

"a vacancy in a city elective office shall be declared to exist by the city council in the event the incumbent thereof:
* * *
(4) Resigns;
(5) Is convicted of a felony * * *."

The conditions of § 206(a) have been met. Cianci was convicted of a felony while serving in the office of mayor. Thereafter, the city council declared the office vacant.[5] Once the office of mayor was declared vacant, § 206(b) became operative. The applicable portion of that section states:

"If a vacancy occurs in the office of mayor * * * more than one hundred eighty (180) days before the time of holding the next succeeding regular city election, the city council shall call a special election for the purpose of filling such vacancy for the remainder of such person's term * * *."

The city council called a special election to fill the unexpired term of office forfeited by the former mayor because of his felony conviction.

The question before this court is Cianci's eligibility under the charter to be a candidate in the special election to elect a successor as mayor of Providence for the unexpired remainder of the term he forfeited. The charter does not expressly address this issue, so we must construe its meaning by determining the intent of the charter commission in drafting, and the General Assembly in enacting, this provision. Resolution of this issue necessitates a determination of the meaning of "vacancy * * * in the office of mayor" and "term of office of the mayor," as this language is used in §§ 202 and 206 of the charter.

One of the elements of the "office of mayor" is the fixed term for which the officer is elected. The charter has fixed the "term of office of the mayor" at four years. The current term of office began in January 1983 and will continue to exist despite a vacancy in the office of mayor until a successor is elected and qualified for the new term beginning in January 1987. A removal of an officer for disqualification does not operate to divide the term or create a new and distinct one. *Day v.*

---

**5.** Cianci also submitted a letter of resignation. However that did not change his status once the city council declared the office vacant pursuant to § 206(a)(5) following his conviction.

*Sharp,* 128 Tenn. 340, 346, 161 S.W. 994, 996 (1913).

■ When Cianci forfeited the "office" of mayor, he was not merely divested of his present right to be mayor and to exercise the powers of the office of mayor. He was also disqualified from serving the rest of the four-year term to which he was elected because the "office" is an entity and the "term of office" is a part of that entity. A person who forfeits the office of mayor pursuant to § 206 of the charter is disqualified from serving for the remainder of the current term. This disqualification remains in effect despite the special election and continues until the end of the current four-year term. "The object of the removal of a public officer for official misconduct is not to punish the officer, but to improve the public service, and to free the public from an unfit officer." *Timothy v. Howse,* 134 Tenn. 67, 78, 183 S.W. 510, 513 (1915).

Cianci's tenure in office was part of the current term. When he forfeited the office, he forfeited it for the remainder of the current term. Section 206(b) of the charter intended this result because it states that the reason for the special election is to fill "the remainder of such person's term." Consequently, Cianci could not be reelected during that term.[6] Generally, "a removal from office bars the removed officer from an election or appointment to fill the vacancy for the unexpired term, but * * * it does not disqualify him to take some other office or to be elected or appointed to a new term of the same office." *Recall Bennett Committee v. Bennett,* 196 Or. 299, 326, 249 P.2d 479, 492 (1952). "The remainder of the existing term is, including its incidents and rights, * * * all the removal can act on or affect." *Thompson v. Crump,* 134 Tenn. 121, 132–33, 183 S.W. 505, 508 (1915).

■ The word "vacancy" generally has no technical meaning, other than "empty" and "unoccupied," as applied to an office without an incumbent. *People v. Osborne,* 7 Colo. 605, 612, 4 P. 1074, 1078 (1884); *Hooper v. Almand,* 196 Ga. 52, 59, 25 S.E.2d 778, 782 (1943); *Paull v. Pierce,* 68 N.J.Super. 521, 528, 172 A.2d 721, 725 (1961). "Vacancy" refers not to the incumbent but to the term or to the office. *Hooper v. Almand,* 196 Ga. at 59, 25 S.E.2d at 783; *see also Hendrick v. Keating,* 120 Conn. 427, 431, 181 A. 340, 341 (1935). The office of mayor of Providence was left vacant because it was not occupied by an incumbent who had the right to continue therein until the next general election.

■ The "office of mayor" is a public office, and the term "public office" has been defined to include the idea of tenure, *duration,* emolument, powers, and duties. *Metcalf & Eddy v. Mitchell,* 269 U.S. 514, 520, 46 S.Ct. 172, 173, 70 L.Ed. 384, 390 (1926); *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 393, 18 L.Ed. 830, 832 (1867); *People v. Duane,* 121 N.Y. 367, 375, 24 N.E. 845, 847 (1890); *Wise v. City of Knoxville,* 194 Tenn. 90, 93, 250 S.W.2d 29, 31 (1952). Three principal tests for determining what constitutes a public office have already been decided in this state: (1) whether the sovereignty, either directly through legislative enactment or executive appointment, or indirectly as through a municipal charter, is the source of the authority; (2) whether the duties pertaining to the position are of a public character, that is, due to the community in its political capacity; and (3) whether the tenure is *fixed and permanent for a definite period by law,* unless forfeited for neglect of duty or malfeasance, or subject to termination at the

---

6. We need not decide whether state law (in particular G.L.1956 (1981 Reenactment) § 13–6–2) prohibits Cianci from holding public office. The issue before the court is whether the charter requires the mayor's removal from office for the full four-year term thereby prohibiting him from acting as a qualified candidate in the special election to fill the remainder of the unexpired term. Our interpretation of the charter—that upon the incumbent's conviction of a felony the office must be declared vacant for the full term—is dispositive of this matter. State law concerning respondent's right to be a candidate in a general election for a full new term is not at issue, and therefore we need not address it.

will of others without the assignment of cause. *Opinion to the Governor,* 83 R.I. 370, 374, 116 A.2d 474, 475 (1955); *Adams v. McCaughey,* 21 R.I. 341, 344–45, 43 A. 646, 648 (1899). The meaning of the word "office" not only includes the entitlement to a salary and the right to exercise certain powers but also includes a fixed period for which the office may be held. *See Spring v. Constantino,* 168 Conn. 563, 568, 362 A.2d 871, 875 (1975); *Recall Bennett Committee v. Bennett,* 196 Or. at 325, 249 P.2d at 491–92. "Office" is not something that is transient, occasional, or incidental. Rather, by nature it is an entity in which incumbents succeed one another, and it does not cease to exist with the termination of incumbency. *City Council v. McKinley,* 80 Cal.App.3d 204, 210, 145 Cal.Rptr. 461, 464 (1978).

Numerous cases from other states support this conclusion. In these cases, which are discussed below, certain officials who were removed from office or declared ineligible for office during the terms to which they had been elected or appointed sought to fill the unexpired portions of their terms. All of these cases hold that the full term or tenure of the officer was a part of and included in the office and that when removed from office, the incumbent was removed for the full term or tenure then being served.

In *Coleman v. Rose,* 74 Kan. 262, 86 P. 296 (1906), the defendant was elected mayor for a term of two years ending in April 1907. In September 1906 an action was brought to remove him from office for misconduct. The court ousted him from office and decreed his ineligibility for the remainder of his term. Shortly thereafter Rose became a candidate at a special election held to fill the vacancy. He was elected and assumed the office. Contempt proceedings were then instituted for violation of the ouster decree. The statute pursuant to which the defendant was removed from office provided that "for a failure or neglect of official duty in the enforcement of this act, any of the city or county officers

herein referred to may be removed by civil action." Kan.Gen.Stat.Ann. § 2462 (1901). There was no statutory provision concerning the eligibility of the defendant following his removal. It was held that the defendant was guilty of contempt. After citing many cases, the court said:

> "The right to exercise the functions of the office of mayor and to enjoy its privileges for the two-year term was an entity conferred on the defendant, and it was that which was taken from him in the *quo warranto* proceeding. The resignation or the removal of an officer during his term and the election or appointment of a successor do not divide the term nor create a new and distinct one. In such a case the successor is filling out his predecessor's term; and when the defendant reentered the office and undertook to exercise its duties he was simply serving a portion of the very term which the court had decided that he was unfit to hold. Since under the law he forfeited and was ousted from the right to occupy the office for the remainder of the term, no subsequent election or appointment could restore to him that which he was adjudged to have forfeited and lost. The electors of the city are as much bound by the law and the judgment rendered in pursuance of the law as their representatives and officers, and the special election did not warrant the defendant in ignoring or violating the judgment rendered under the law." *Id.* at 268, 86 P. at 298.

In *Childs v. Dart,* 57 Minn. 261, 59 N.W. 190 (1894), a county treasurer was removed for the misappropriation of public funds. Afterward the board of county commissioners, which had the authority to fill the vacancy, elected him to fill out the term. The question arose whether the board had the power to reinvest him with the office. The court said:

> "The removal proceedings cannot be nullified or reversed in that manner. Such removal proceedings are not merely for the purpose of ousting the person hold-

ing the office; they include a charge that he has forfeited his qualification for the office for the remainder of the term. They are brought to declare a forfeiture of a civil right, his eligibility, his qualification to hold that office for the rest of that term. The proceeding is not brought for his removal from a day or a week or a month of his term, but for the whole of the remainder of his term[.] * * * Nothing less is involved in the proceedings. Whether the voters at the polls could condone the offense by which he forfeited his office it is not necessary here to decide. We are of the opinion that the county commissioners could not do so." *Id.* at 263, 59 N.W. at 190.

In *Day v. Sharp,* 128 Tenn. 340, 161 S.W. 994 (1913), the defendant had been found ineligible to hold a county office. Thereafter the county court, a body equivalent to a council, elected him to the same office. In a civil proceeding the State Supreme Court held the defendant ineligible and said:

"In our opinion this question involves a consideration of what is the meaning of the word 'office' used in the constitution and statute. The word has been held, in such connection, to imply the right to exercise the functions of a public trust or employment, and to receive the fees and emoluments belonging to it, and to hold the place for the term prescribed by law." *Id.* at 346, 161 S.W. at 995–96.

The court held that the defendant was not eligible to serve the remainder of his original term. The ouster statute in that case provided that if the defendant was found guilty, judgment of ouster should be rendered. There was no statutory provision concerning his eligibility after ouster.

In *Thompson v. Crump, supra,* the court said:

"So when one is removed from an office, he is removed for the current term, and he cannot thereafter be re-elected to that term. This is so because the term is part of the office.

Accordingly, when defendants were removed from the offices of mayor and vice-mayor, they were deprived of the right to exercise certain functions and receive certain compensation, and they were deprived of that right for their terms then current. A removal from office extends to the limit of the current term, but such removal, unless a statute give it greater effect, cannot go beyond the current term because the office itself is limited by the term. If we go beyond the current term, then we have to deal with another office." 134 Tenn. at 131–32, 183 S.W. at 507.

The court in *People v. Ahearn,* 196 N.Y. 221, 89 N.E. 930 (1909), held that a removal conclusively determined that the officer was not legally fit to continue in public office during the term and that the removal covered the entire term. The court stated:

"Doubtless we might say, as so earnestly urged by counsel, that the strict letter of the statute would be satisfied by a removal which ousted appellant from his office for a day or an hour until some appointing power could reinstate him. But if we consider the general scope and purpose of this statute we shall be led to the conclusion that the legislature must have contemplated and intended more than this and that the language which it employed is susceptible of a construction which will carry out its purpose.

It is equally clear * * * that this purpose will be frustrated and the administration of the law turned into a farce if under it an official may be immediately reappointed and a removal turned into a mere temporary suspension. In order to avoid such a result and keeping in mind the purpose of the statute we are justified * * * in construing the removal for which it provides as meaning a permanent and lasting ouster for the entire remaining term of the incumbent from the office which he has been filling and whose obligations he has been found unable or unwilling to discharge. * * * [A]n office implies 'much more than the right to physically occupy a specified room, to exercise certain power and to

receive a prescribed emolument.' So far as its beneficial aspect was concerned, appellant's office consisted of the right to enjoy certain powers, privileges, honors and emoluments for a given term, and when the statute prescribed that he should be removed it may be construed to mean that he should be removed from and deprived of all that which thus made up his office, namely, the right to enjoy these things for and during the entire term for which he had originally been selected. It is of course true, as is argued by counsel, that we do not speak of removing an official from his 'term' of office. But the right to enjoy for a certain period the privileges and profits of a given position is an important element of an office in its complete conception, and a removal from the office under the conditions here present may fairly mean a dismissal for that period from those rights and privileges." *Id.* at 229–30, 89 N.E. at 932–33.

 Finally, under numerous decided cases, there is no merit to Cianci's argument that the voters have the right to decide whether he should be reelected to serve the remainder of his term as mayor or that the will of the voters in the special election should prevail over that of the General Assembly as expressed in the charter. "It is well established that the voters may not vote for a person not qualified to hold office." *State v. Musto,* 187 N.J.Super. 264, 318, 454 A.2d 449, 479 (1982); *see also Stothers v. Martini,* 6 N.J. 560, 566, 79 A.2d 857, 859 (1951). "While the people have 'the right to select unworthy candidates, candidates whom the Legislature fear might bring ruin to the state' * * *, the voters have no right to vote for a disqualified candidate." *State v. Musto,* 187 N.J.Super. at 319, 454 A.2d at 480. "The electors of the city are as much bound by the law and the judgment rendered in pursuance of the law as their representa-

tives and officers." *Coleman v. Rose,* 74 Kan. at 268, 86 P. at 298. "We are a government of law, not of [persons]. And the law must be enforced as the representatives of the people intended." *State v. Musto,* 187 N.J.Super. at 320, 454 A.2d at 480.

 The voters of Providence, by approving the charter in November 1980, and the people of the state, through the General Assembly's ratification of the charter, established a minimum qualification they wanted their elected officials to possess. The people decided that they did not want a person who has been convicted of a felony to hold a public office in the city, regardless of the identity of the individual or the nature of the office. This threshold determination of eligibility is similar to the minimum qualifications that the United States Constitution places on the candidate who seeks the presidency of the United States— that he or she be at least thirty-five years old, has been a United States resident for at least fourteen years, and be a natural-born citizen. U.S.Const. art. II, § 1. These qualifications are established and upheld regardless of who the individual is that seeks elective office. Accordingly, there is no merit to the argument that the voters have a right to decide whether Cianci should be reelected to the remainder of the term that he forfeited, regardless of his disqualification therefrom.[7]

## IV

Comment must be made concerning the dissenting opinions. Justice Murray suggests that article XXXIX of the amendments to the Rhode Island Constitution sets forth the entire qualification for election to public office and presumably the right to hold public office. She contends that article XXXIX sets as the only requirement for the holding of office that a person

---

**7.** The holding in *Chase v. Burns,* 114 R.I. 485, 335 A.2d 334 (1975), is not inconsistent with our holding today. In *Chase* the court was not considering the status of a person who had

become disqualified for the office in question. Rather, the issue was the method of presentation of qualified candidates on the ballot.

"be a qualified elector for such office." She then defines "qualified elector" in accordance with article XXXVIII, section 1. Justice Murray's interpretation of article XXXIX read together with article XXXVIII would inevitably force one to conclude that the voters of the city of Providence in adopting the charter, and the General Assembly in ratifying the charter, did not have the power to add any requirements to the holding of public office save those set forth in the constitution. If that is true, then § 206(a) of the charter, which provides for a forfeiture of public office by an incumbent who commits a felony, was a nullity and of no further force and effect. Accordingly, Cianci did not forfeit the office and, save for his ill-advised resignation, would still occupy the same. Consequently, had he chosen to remain in office, no special election in the city of Providence would have been necessary. No one, not even Cianci, has pressed this argument.

As is succinctly set forth in the dissenting opinion of the Chief Justice, the General Assembly does have the power to add reasonable requirements to those that are set forth in the constitution. (Chief Justice Bevilacqua's dissenting opinion at page 1219.) It was in the exercise of this plenary power that the General Assembly ratified § 206 of the Providence Home Rule Charter to provide for a vacancy or forfeiture in office by an incumbent who has committed a felony. Such power to this moment has been unquestioned, even by Cianci. The power to declare a forfeiture in a public office must of necessity include the power to determine whether the individual who forfeits the office is eligible to succeed himself during the term of said office.

Both the Chief Justice and Justice Murray are of the opinion that it is inappropriate for this court to determine by interpretation the intent of the framers of the charter in promulgating it and the General Assembly in ratifying it. The Chief Justice appropriately cites *Kastal v. Hickory House, Inc.*, 95 R.I. 366, 369, 187 A.2d 262, 264 (1963), for the proposition that "only where the Legislature sounds an uncertain trumpet may the court move in to clarify the call." We accept fully the wisdom of that statement of the principle. However, in this instance, § 206 of the charter does sound an uncertain call. Having provided for a forfeiture of public office on the part of one who commits a felony, and then having provided for a special election to fill the vacancy thus caused, the charter is silent upon the eligibility of such incumbent to run in the special election. It is this uncertain call that requires this court to determine the intention of the framers. We have often stated that in the interpretation of legislative intent, every effort should be exercised in order to avoid unjust, absurd, or unreasonable consequences. *Coletta v. State*, 106 R.I. 764, 263 A.2d 681 (1970); *Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745 (1968); *Town of Scituate v. O'Rourke*, 103 R.I. 499, 239 A.2d 176 (1968). In the case at bar, the Providence city charter, as ratified by the General Assembly, provided for the forfeiture of an office on the part of an incumbent who had been convicted of a felony. Section 206 of the charter then provides for a special election to fill the office. It would indeed be unreasonable and absurd to interpret the forfeiture in such a way as to allow the convicted person forthwith to succeed himself by virtue of a special election. Section 206(a) of the charter would be rendered nugatory in the event that one who forfeits the office could immediately refill it in the special election brought about by his or her own conviction. Again, this court has clearly declared on numerous occasions that it will not ascribe to the General Assembly an intent to enact legislation that is inefficacious or nugatory. *Kingsley v. Miller*, 120 R.I. 372, 388 A.2d 357 (1978); *Town of Scituate v. O'Rourke*, 103 R.I. 499, 239 A.2d 176 (1978); *Ewing v. Frank*, 103 R.I. 96, 234 A.2d 840 (1967). In this case, as in *Kingsley v. Miller*, "the legislative purpose, though imperfectly expressed, is clear." 120 R.I. at 376, 388 A.2d at 360.

Justice Murray's reliance on a statement in *Bailey v. Baronian*, 120 R.I. 389, 398, 394 A.2d 1338, 1342 (1978), relative to the Legislature's inability to "limit a provision of the Constitution" also merits a response. In doing so, we refer to the context in which that statement appeared. *Bailey* was challenging the actions of the Providence Board of Canvassers in striking his name from the voting list because of a larceny conviction in the State of Michigan for which he was sentenced to a two-to-five-year prison term. The sole issue in *Bailey* was whether the disenfranchisement provision found in section 1 of article XXXVIII of the amendments to the Rhode Island Constitution was applicable to out-of-state convictions emanating from the other forty-nine states or the federal judicial system.

After noting the absence of any clear indication of the intent of the drafters of the 1973 amendment as well as the lack of any precedential opinion of this court, the *Bailey* court referred to the diversity of judicial opinion on the issue. Some courts had taken the position that only a conviction obtained in their respective jurisdictions would come within the reach of a disenfranchisement provision. Others applied their own law to determine if the out-of-state conviction would amount to a felony under the law of the disenfranchisement jurisdiction. The majority of jurisdictions had ruled that a conviction anywhere would disqualify one otherwise eligible to vote. Bailey, in contending that the loss-of-the-right-to-vote proviso in article XXXVIII was restricted to felonies committed in Rhode Island, had argued that § 13–6–2 of the General Laws, which disenfranchises an individual who has been sentenced to imprisonment in the ACI for more than a year, limited constitutional disenfranchisement in Rhode Island to those who had served more than a year at the ACI. In rejecting this argument, the *Bailey* court at one point did respond: "But this argument misses the mark. No act of the General Assembly can 'limit' a

provision of the constitution." *Id.* at 398, 394 A.2d 1338.

Before us, Cianci focuses on the statement regarding limitation and seeks to use it as a legal basis for his claim that he was entitled to be a candidate at the special election because he remained a qualified voter notwithstanding the imposition of the suspended prison sentence. However, he ignores the fact that when the *Bailey* court spoke of legislative impotence, it did so after earlier referring to the absence of any clear indication of the intent of the framers of the suffrage amendment as well as the lack of any precedential decision of this court relating to the issue presented by Bailey. In fact, the court in *Bailey* described his limitation theory as "anomalous, illogical, and unjust," pointing out that it would be difficult to believe that the 1973 framers of article XXXVIII intended that one guilty of an innocuous felony— such as engaging in a prearranged fight in another state, a felony in Rhode Island under the provisions of § 11–12–8 of the General Laws—would forfeit his right to vote, but a husband who had been convicted of murdering his wife in an adjoining state would be permitted to take up residence in Rhode Island where he would be entitled to appear at the polls and vote.

In substance, the dictum in *Bailey* was designed to emphasize that it was the task of this court to interpret the disenfranchisement provisions of section 1 of article XXXVIII of the Rhode Island Constitution. In performing that task, the court was not limited by an act of the General Assembly that dealt with a related subject. In enacting § 13–6–2 of the General Laws, the General Assembly had not passed legislation in execution of the constitutional provision but had merely acted to implement a portion of the ban set forth in the constitution. The statute did not purport to inhibit or limit the reach of the constitutional provision for disenfranchisement as it might apply to one convicted in another jurisdiction. We pointed out by this dictum that had the General Assembly attempted to do so, it

would have been acting beyond its powers. In the case at bar we deal with a charter provision enacted by the General Assembly that in no way conflicts with or attempts to limit any provision of the Constitution of this state.

For the reasons previously set forth, we conclude that the framers of the charter in promulgating it, the voters of the city of Providence in adopting it, and the General Assembly in ratifying it clearly intended to work a forfeiture upon one who holds elective office and, while so doing, is convicted of a felony. This forfeiture could be meaningful and efficacious only if the person so convicted is made ineligible to serve in said office for the remainder of the term for which he was initially elected. Any other interpretation would lead to a ludicrous result.

## V

We hold therefore that the office of mayor is an entity and that the term of office is a part of the entity. If an elected official in the city of Providence is removed from office, the removal is for the remainder of the term to which he or she was elected. The office was to be held for a full four-year term—the disqualification therefore is for the same period. Under the charter, and based upon the above reasoning and foregoing authorities, Vincent A. Cianci, Jr., was not legally qualified to be a candidate in the special election held to fill the vacancy in the office of mayor of Providence for the unexpired term.

For the reasons stated, on June 25, 1984, we entered an order granting the petitions for certiorari and on July 6, 1984, we entered an order quashing the decisions below. We now order the papers in the case remanded to the board of elections with our decision endorsed thereon.

BEVILACQUA, Chief Justice, dissenting.

I respectfully disagree with the majority. I believe its action constitutes an impermissible intrusion into the legislative realm.

My colleagues concede that the charter is silent on the issue of whether Vincent Cianci may be a candidate in the mayoral special election. Accordingly, they stated, they must "construe" the charter to answer the question before this court. Their construction of the charter, however, was totally unnecessary, and, in my opinion, improper.

It is a fundamental principle of statutory construction that this court must give effect to the whole of a statute and assign all of the words used therein their plain and ordinary meaning. *Murphy v. Murphy*, R.I., 471 A.2d 619, 622 (1984); *Rhode Island Chamber of Commerce v. Hackett*, R.I., 411 A.2d 300, 303 (1980). We have repeatedly stated that when a statute is unambiguous, the statute must be interpreted literally and "[n]o interpretation is required or permitted." *Statewide Multiple Listing Service, Inc. v. Norberg*, 120 R.I. 937, 941, 392 A.2d 371, 373 (1978); *see also, Pacheco v. Lachapelle*, 91 R.I. 359, 361–62, 163 A.2d 38, 40 (1960).

The majority states that there is a need to determine the meaning of "vacancy * * in the office of mayor" and "term of office of the mayor" as used in §§ 202 and 206 of the charter. However, there is no need to define these phrases. Section 202 clearly defines "term of office of the mayor" and § 206 defines vacancies in elective offices, including the office of mayor. There are no ambiguities surrounding these terms as they are used in the charter; the meaning of these terms was never a question for this court. The only issue before this court is whether Cianci can run as a candidate in the special mayoral election.

Section 202 merely states that a term of office for mayor and city council members "begin[s] on the first Monday in January next following their election, and each person shall hold office until his or her successor is elected and qualified; provided, however, that no such office becomes vacant before the end of the term as a result of a recall pursuant to section

208 of this article, or from other causes, pursuant to section 206 of this article."

The charter fails, however, to address the specific issue that is before this court, namely whether a candidate who resigned from office may thereafter seek election to the unexpired term of that office. The charter, however, is completely silent on this issue. There are no ambiguities for this court to construe. The majority fails to recognize, and completely ignores, the rule of construction enunciated by this court that

"[o]nly when the legislature sounds an uncertain trumpet may the court move in to clarify the call. But when the call is clear and certain as it is here we may not consider whether the statute as written comports with our ideas of justice, expendiency or sound public policy. In such circumstances that is not the court's business." *Kastal v. Hickory House, Inc.*, 95 R.I. 366, 369, 187 A.2d 262, 264– 65 (1963).

Thus, it is clear that in the case at bar "[w]e have neither the authority nor the competence to rewrite [the charter] in order to bring it into conformity with [Dr. Gelch's] concept of how the [charter] should have been drafted." *State v. Calise*, R.I., 478 A.2d 198, 201 (1984).

It is the exclusive authority of the General Assembly to remedy any inadequacies, real or perceived, in matters of state and local elections.[8] *Gomes v. Rhode Island State Board of Elections*, 120 R.I. 951, 955, 393 A.2d 1088, 1090 (1978). This court cannot, by judicial fiat, create an answer to the question before this court. *Id.* at 958, 393 A.2d at 1091. "[T]he remedy is to be found in the state house, not the courthouse." *Malinou v. Board of Elections*, 108 R.I. 20, 35, 271 A.2d 798, 805 (1970).

Even if there existed an ambiguity in the charter for this court to interpret, I would still disagree with the majority. My colleagues stated that they would "construe" the charter by "determining the intent of the charter commission in drafting, and the General Assembly in enacting, this provision." This they accomplished by looking not to any Rhode Island legislative history but rather, to case law of other jurisdictions. Their analysis focuses upon other courts' interpretation of the phrase "term of office" and is, in my opinion, insufficient for several reasons.

First, the case law cited generally dates back to the later part of the last century and the early part of this century. These cases are inadequate and antiquated for they predate current concepts of due-process, equal-protection, and First Amendment rights that are relevant to the instant controversy.

Second, the majority opinion fails to acknowledge that opposing authority, albeit minor and also dated, exists. *See Commonwealth v. Huntsman*, 237 S.W.2d 876 (Ky.1951); *State ex rel. Tyrrell v. Jersey City*, 25 N.J.Law 536 (1856).

In *State v. Jersey City*, the court found that absent an express legislative mandate to the contrary, a public official who was expelled from his office could run for reelection to the same office.

"These * * * are questions for the lawmaking power to consider. It is for the legislature to say [that the official cannot be reelected to his office]. The Legislature may well have supposed that the power to expel was all that was necessary; and that what remained might safely be trusted to the hands of the voting members of the corporation." 25 N.J.Law at 543.

I believe that this approach is far more reasonable than that employed by the majority. Indeed, it comports with our own law concerning matters of judicial review and statutory construction. *See Gomes v. Board of Elections*, 120 R.I. at 955–58, 393

---

**8.** It is fundamental that "the Rhode Island Constitution vests in the General Assembly exclusive authority over state and local elections and the manner of conducting those elections." *Gomes v. Rhode Island State Board of Elections*, 120 R.I. 951, 955, 393 A.2d 1088, 1090 (1978).

A.2d at 1090–91; *Kastal v. Hickory House, Inc.*, 95 R.I. at 369, 187 A.2d at 264–65.

Finally, I fail to comprehend the majority's interpretation of our Legislature's intent; there is no rule of construction of which I am aware that dictates that the intent of a legislature from one jurisdiction may be determined solely by reference to case law of other jurisdictions without reference to any legislative history whatsoever. The majority relies upon old case law of other jurisdictions to support its position. In determining the intent of the Legislature we must, however, rely upon legislative history as well as statutory rules of construction.

The Rhode Island Constitution enumerates the basic requirements that encompass an individual's right to vote, and additionally provides that the right to hold public office extends only to duly qualified electors. *See* R.I. Constitution, articles XXXVIII and XXXIX. It is axiomatic that the Rhode Island Constitution is an instrument of limitation and that, as such, it operates to restrict the power of the General Assembly where the Constitution has spoken. *Nugent v. City of East Providence*, 103 R.I. 518, 525, 238 A.2d 758, 762 (1968). The otherwise plenary power of the Legislature, however, allows the General Assembly to legislate in those areas in which the Constitution is silent. *Opinion to the Governor*, 95 R.I. 109, 114–15, 185 A.2d 111, 114 (1962). I recognize that the Legislature may enact additional reasonable requirements that do not contravene the constitutional mandates surrounding an individual's eligibility to vote and hold public office. I must respectfully disagree, however, with the majority's conclusion that this court is free to read additional restrictions or limitations into a charter provision that is admittedly silent on the matter.

The General Assembly has in the past enacted additional requirements and restrictions upon the right to vote and seek elective office. Indeed, the Legislature has promulgated an elaborate system of elec-

tion laws designed to provide for the orderly administration of these rights. Included in these laws is a requirement that an individual seeking elective office obtain a minimal number of voter signatures prior to certification as a candidate. General Laws 1956 (1981 Reenactment) § 17–14–7, as amended by P.L.1982, ch. 160, § 1 and § 17–16–8, as amended by P.L.1982, ch. 160, § 2. Additionally, chapter 9 of title 17 contains highly specific registration requirements with which an individual must comply before he or she can become a qualified elector. Chapter 24 of title 17 further details specific election offenses and their accompanying sanctions.

These provisions indicate the Legislature's willingness to reasonably restrict the right to vote and hold public office. This analysis, however, makes it abundantly clear that in every instance in which the General Assembly has sought to enact a limitation upon the right to vote or hold office, it has done so by means of a clear and unequivocal legislative mandate. In the instant case, however, the majority concedes that the charter does not address the particular issue under consideration. Notwithstanding this fact, the majority would read in an express intent to bar an individual from seeking reelection. In light of the Legislature's previous pattern of explicitly delineating any statutory restrictions on the right to vote or hold public office, I conclude that the silence of this particular provision is not indicative of an intent to create an additional restriction or qualification on the right to seek elective office. The majority strains to reach an interpretation that is fundamentally at odds with the basic rules of statutory construction. Consistent with this belief on my part, I decline to construe the charter as precluding Mr. Cianci from seeking election to the unexpired term from which he resigned.

MURRAY, Justice, dissenting.

I cannot agree with the result reached by the majority today. It is my opinion that the requisite qualifications for seeking

elective office in the State of Rhode Island are explicitly and exclusively set out in article XXXIX, section 1, of the Articles of Amendment to the Rhode Island Constitution. It is my firm conviction that any provision of a city charter or state statute that purports to supplement or modify the provisions of art. XXXIX, sec. 1, are unconstitutional.

It is conceded by petitioner that Vincent A. Cianci, Jr., did not lose his status as a qualified elector when he entered a plea of nolo contendere to the charges against him and received a suspended sentence from the trial justice. Despite this fact, the majority holds that the language of art. XXXIX, sec. 1, is not exclusive, that it sets only minimum standards of qualification upon an individual's right to hold public office, and that other qualifications not inconsistent with the Constitution can be prescribed by the General Assembly. In so doing, I believe that the majority strains the logic of our prior holdings and ignores established principles of constitutional jurisprudence to reach a highly questionable result.

Article XXXIX, sec. 1 provides that "[n]o person shall hold any office unless he be a qualified elector for such office." The

term "qualified elector" is not defined in art. XXXIX, although its meaning is clearly set out in art. XXXVIII, sec. 1, of our Constitution.[9]

Basic principles of constitutional construction support the position that the language of art. XXXVIII, sec. 1, defines the meaning of the term "qualified elector" in its companion amendment, art. XXXIX. The contemporaneous adoption of these two amendments and the identical subject matter that they address demand that art. XXXIX, sec. 1, be construed in such a manner.[10]

This court has previously stated that when "two amendments are adopted on the same day they must be construed together and effect given to both. Differences, if there are any, must, if possible, be reconciled." *Opinion to the Governor*, 78 R.I. 144, 148, 80 A.2d 165, 167 (1951) (quoting 1 Cooley Con.L. (8th ed.) chap. IV, 129).[11] It has also been stated that different constitutional provisions relating to the same subject are in *pari materia* and therefore should be construed together and read in light of each other. *See Kilpatrick v. Superior Court of Maricopa*, 105 Ariz. 413, 419, 466 P.2d 18, 21 (1970); *Idaho Tel. Co. v. Baird*, 91 Idaho 425, 429, 423 P.2d 337,

---

**9.** Article XXXVIII, sec. 1 provides:

"Every citizen of the United States of the age of eighteen (18) years or over who has had his residence and home in this state for thirty (30) days next preceding the time of voting, who has resided thirty (30) days in the town or city from which he desires to vote, and whose name shall be registered at least thirty (30) days next preceding the time of voting as provided by law, shall have the right to vote for all officers to be elected and on all questions submitted to the electors, except that no person who has been lawfully adjudicated to be non compos mentis shall be permitted to vote. Nor shall any person otherwise qualified to vote as provided in this article be permitted to vote while serving a prison sentence on final conviction of a felony nor subsequent to such imprisonment until the franchise shall have been restored by an act of the general assembly. The general assembly may provide by law for shorter state and local residence requirements to vote for *electors* for president and vice president of the United States."

**10.** Articles XXXVIII and XXXIX were adopted by the people of the State of Rhode Island on the same day, and both affect the same subject matter. Articles XXXVIII and XXXIX were adopted by the people on November 6, 1973, at a limited constitutional convention that was convened pursuant to P.L. 1973, ch. 98. One of the four enumerated purposes for convening the 1973 convention, to consider constitutional amendments relating to the "revision of the election laws," P.L. 1973, ch. 98, § 1, formed the substance of these amendments. Article XXXVIII, entitled "Of Suffrage," and art. XXXIX, entitled "Qualification for Office," both effected revisions in the prevailing election laws.

**11.** This rule comports with its federal counterpart that amendments adopted at the same time, or at substantially the same time, must be construed together to discern the intent of the framers. *See Patton v. United States*, 281 U.S. 276, 298, 50 S.Ct. 253, 258, 74 L.Ed. 854, 863 (1930).

341 (1967); *Grantz v. Grauman*, 302 S.W.2d 364, 366 (Ky., 1957); *State v. Sherrill*, 142 Ohio St. 574, 578, 53 N.E.2d 501, 504 (1944).[12]

Applying the above rules to the case at bar, I can see no inconsistency between the provisions of art. XXXVIII, sec. 1 and those contained in art. XXXIX, sec. 1. When both of these amendments of our constitution are construed together, it is obvious that the meaning of the term "qualified elector" in art. XXXIX, sec. 1, is explicitly defined in art. XXXVIII, sec. 1. And having given explicit meaning in Article XXXVIII to the only constitutional language limiting an individual's eligibility for public office under art. XXXIX, I must conclude that the intent of the framers of art. XXXIX was to make its disqualification provision exclusive. It defies my sense of logic to conclude that the delegates to the 1973 convention would so particularize the qualifications for voting in art. XXXVIII, sec. 1, make qualified electorship the only requirement for public-office holding in art. XXXIX, and not intend that an individual's compliance with the provisions of art. XXXIX, sec. 1, would entitle him to hold public office. It is my position, therefore, that unless a candidate becomes ineligible to vote under the express provisions of art. XXXVIII, sec. 1, he is qualified to hold public office in the State of Rhode Island, absent another constitutional provision disqualifying his candidacy.[13]

It is plain that Vincent A. Cianci, Jr. has not lost his right to vote under art. XXXVIII as a result of his felony conviction and suspended sentence. Article XXXVIII only disenfranchises those persons who have *served* a prison sentence upon final conviction of a felony, not individuals like Mr. Cianci, who have received suspended sentences for their felony convictions without ever serving a day in jail. *See Bailey v. Baronian*, 120 R.I. 389, 394, 394 A.2d 1338, 1340 (1978).

Consequently, had the majority's analysis of his eligibility to be a candidate in the special mayoral election confined itself to the Constitution of this state, it would have been forced to conclude, as I have, that Mr. Cianci is eligible to be a candidate in this election. Instead, however, my brethren in the majority insist upon looking beyond the express provisions of arts. XXXVIII and XXXIX to the ambiguous terms of a city charter to invalidate his candidacy. As justification for embarking upon such an intellectual journey, they have reasoned that the negative wording of art. XXXIX, sec. 1, demonstrates an intent upon the part of its framers to set only minimal, nonexclusive standards of eligibility for public-office holding. Such a position I find indefensible under the law.

A fundamental rule of constitutional construction is to give effect to the constitution as a whole, including every clause and section, and to avoid resort to any extrinsic aids in construing the meaning of constitutional provisions.

"Every such instrument is adopted as a whole, and * * * [i]f any section of a law be intricate, obscure, or doubtful, the proper mode of discover its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another. And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law.

"This rule is applicable with special force to written constitutions, in which

---

**12.** Sound justification for this latter rule exists. Although the meaning of one section of a constitution standing alone may frequently be ambiguous, that same section's meaning will become readily discernible when construed in relation to other portions of the same instrument. *Collins v. Jackson,* 119 Miss. 727, 741–42, 81 So. 1,

5–6 (1919); *Killgrove v. Morriss,* 39 Nev. 224, 226–27, 156 P. 686 (1916).

**13.** *See, e.g.* art. 9, sec. 2 of the Rhode Island Constitution, which prohibits any person convicted of bribery in connection with his own or another's election from holding public office.

the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication." 1 Cooley, *A Treatise on the Constitutional Limitations*, at 127–29 (8th ed. 1927).

It is my conviction that when arts. XXXVIII and XXXIX were adopted, the delegates to the 1973 convention left nothing to implication. Fully cognizant of the momentous task for which they had been elected, they deliberated thoroughly and spoke in plain and unambiguous terms. They defined the qualifications for classification as an eligible voter in art. XXXVIII, sec. 1, and then made that qualification the only restriction upon public-office holding in art. XXXIX. If they had intended that additional limitations be placed upon eligibility for public office, they would have so stated. The framers of a constitution, and the people who have adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 188, 6 L.Ed. 23 (1824); *see also South Carolina v. United States*, 199 U.S. 437, 449, 26 S.Ct. 110, 111, 50 L.Ed. 261, 265 (1905).

In support for its holding that art. XXXIX, sec. 1, sets only minimal qualifications upon an individual's eligibility for public office, the majority directs our attention to two previous opinions of this court. In neither one can I find any support for the interpretation of art. XXXIX embraced by the majority today. In *Conrad v. Narragansett Board of Canvassers*, R.I., 420 A.2d 50 (1980), we explicitly noted that we were not faced with any constitutional challenges to our state's election statutes.

"The parties have in their briefs and oral arguments raised no issues arising either under the Constitution of the State of Rhode Island or the Constitution of the United States. Thus, this case presents to us only one issue, that of the construc-

tion of § 17–14–2 in light of the requirements of § 17–1–3." *Id.* 420 A.2d at 51.

In *Rawlinson v. Board of Canvassers of Woonsocket*, R.I., 420 A.2d 52 (1980), we similarly did not address any constitutional issues. Our per curiam order in *Rawlinson*, issued one day after the *Conrad* decision, simply declared the petitioner ineligible for the Woonsocket mayoral election based upon "the reasons set forth in our opinion in *Conrad* * * *." *Id.* 420 A.2d at 53. Nowhere in either case is there any discussion of art. XXXIX or the rule of law to apply when a state-elections statute conflicts with an explicit provision of our Constitution.

For such a rule, however, we need only direct our attention to the recent case of *Bailey v. Baronian*, 120 R.I. 389, 394 A.2d 1338 (1978). In *Bailey*, this court rejected the petitioner's argument that G.L.1956 (1969 Reenactment) § 13–6–2 could interpret or limit art. XXXVIII, sec. 1. In a unanimous opinion of this court, it was stated that "[n]o act of the General Assembly can 'limit' a provision of the constitution." 120 R.I. at 398, 394 A.2d at 1342. In so stating, this court reaffirmed the most basic axiom of constitutional construction that statutory provisions inconsistent with an express provision of our Constitution are void.

The mandate of *Bailey* would therefore allow Mr. Cianci to run as a candidate in this special election. Certainly if a state statute cannot supplant or limit a constitutional provisional, a provision of a city charter enacted pursuant to general enabling legislation cannot be entitled to more judicial deference. And even were I to conclude, as the majority has done, that sections 202 and 206 of the Providence Home Rule Charter of 1980 does not limit art. XXXIX, sec. 1, but only adds to the provisions therein, I would still find him eligible to run. Sections 202 and 206 place additional restrictions beyond those contained in our Constitution upon Mr. Cianci's qualifications for public office. This addition in itself contravenes our Constitution. As

this court has previously said, "[U]nless a contrary intent clearly appears on the face of the provision, absent equivocal or ambiguous language, the words [in a constitution] cannot be interpreted or extended but must be applied literally." *Davis v. Hawksley*, 119 R.I. 453, 455, 379 A.2d 922, 923 (1977) (citing *Andreozzi v. D'Antuono*, 113 R.I. 155, 158, 319 A.2d 16, 18 (1974); *Podborski v. Haskell Mfg. Co.*, 109 R.I. 1, 8, 279 A.2d 914, 918 (1971)).

I further believe that strict adherence by this court to the rules announced in *Bailey* and *Davis* is mandated here because this case involves a restriction upon a fundamental right possessed by all citizens in a democratic society. As we have previously stated, "[c]andidacy for public office is one of the rights included within the scope of the first amendment." *Cummings v. Godin*, 119 R.I. 325, 335, 377 A.2d 1071, 1075 (1977) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

To construe art. XXXIX, sec. 1, of our Constitution as the majority has done therefore has infringed upon the fundamental right of Vincent A. Cianci, Jr., to seek elective office. Although the majority opinion sanctions this infringement based upon its view of incorporation principles under the Fourteenth Amendment, this argument misses the mark. Where "two constructions of a constitutional provision are reasonably possible, one of which would diminish or restrict a fundamental right of the people and the other of which would not do so, the latter [construction] must be adopted." *In Re the Constitutional Convention*, 55 R.I. 56, 73, 178 A. 433, 441–42 (1935). Consistent with our earlier opinion, I would construe the provisions of art. XXXIX as being exclusive of all state statutes and city charters and declare Vincent A. Cianci, Jr., eligible as a candidate in the impending election.

The final reason that I cannot endorse the decision reached by the majority today relates to the plain fact that the Providence Home Rule Charter is silent upon the question of Vincent A. Cianci, Jr.'s eligibility for this special election. Although my brethren in the majority ingeniously and persuasively interpret §§ 202 and 206 of the city charter to demonstrate that Mr. Cianci's resignation from his mayoral office is effective for the entire four-year term for which he was previously elected, no litany or review of federal and state court cases dissuades me from the conclusion that the Rhode Island Constitution has declared in plain and unambiguous terms that he remains an eligible candidate in the upcoming special election.

In its most essential form, this dispute involves nothing more than a conflict between a silent charter and an express constitutional provision. Even if I were of the opinion that these two documents were not inconsistent, I would still conclude that the provisions of the Constitution should prevail. And even though the drafters of the home-rule charter may never have countenanced a scenario in which an incumbent mayor would resign from his office following final conviction of a felony—and then seek to be a candidate in the special election held to fill the vacancy created by his resignation—they must live with its actual terms. If the drafters of the Providence Home Rule Charter wished to prohibit individuals like Mr. Cianci from being candidates in special elections held pursuant to § 206, they should have said so in no uncertain terms. Their failure to do so should not be remedied by an act of judicial activism upon the part of this court. The drafters had their opportunity to prevent the "evil" for which this court now provides relief. Having not done so, they should be bound by its existing terms.

Although many might cynically conclude that any constitution that permits Mr. Cianci to be a candidate in this election is one that is in sad shape and in serious need of revision, any changes in our Constitution should not be wrought by a construction of this court. To these individuals, I would only remark that we must live with the document as it was written, and until it be

properly amended, it remains the supreme law of our state.

As the learned Professor Cooley so ably stated:

"A court or legislature which [would] allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. The violence of public passion is quite as likely to be in the direction of oppression as in any other; and the necessity for bills of rights in our fundamental laws lies mainly in the danger that the legislature will be influenced, by temporary excitements and passions among the people, to adopt oppressive enactments. What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require." 1 Cooley, at 124.

For all of the above reasons, I respectfully dissent.